Wayne H. GARDNER, Appellant,

v.

MISSOURI STATE HIGHWAY PATROL
SUPERINTENDENT, Respondent.

No. WD 48788.

Missouri Court of Appeals,
Western District.

April 4, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 30, 1995.

Application to Transfer Denied
July 25, 1995.

Nicholas M. Monaco, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P.J., and BRECKENRIDGE and SPINDEN, JJ.

BRECKENRIDGE, Judge.

Corporal Wayne H. Gardner appeals his dismissal from the Missouri State Highway Patrol (the Patrol) after the Highway Patrol Disciplinary Board (the Board) found Corporal Gardner guilty of insubordination and of refusal to comply with a direct order to submit to a polygraph examination.

Corporal Gardner raises eight points on appeal, arguing (1) that the Missouri Highway Patrol and Colonel Fisher, the agency's superintendent, acted in excess of their authority in dismissing him, because the record does not establish that the Board appointed to hear his case was composed of at least three members of the same political party as Corporal Gardner; (2) that his termination for refusing to take a polygraph examination was unconstitutional in that Corporal Gardner had not been granted immunity sufficient to supplant the privilege against self-incrimination; (3) that the orders for him to submit to a polygraph examination were unreason-

able, arbitrary and capricious, because Missouri courts have found polygraph examinations to be unreliable; (4) that the Board's finding that Corporal Gardner had refused to take a polygraph examination was arbitrary, capricious and not supported by the competent and substantial evidence, because he was never lawfully ordered to submit to a polygraph examination; (5) that the Board erred in disregarding testimony indicating Corporal Gardner had in fact taken a polygraph examination; (6) that Corporal Gardner's termination was improper because Colonel Fisher did not read the entire record of the Board hearing, including all the evidence, before carrying out the Board's recommendation of dismissal; (7) that the Missouri Highway Patrol had no authority to order Corporal Gardner to submit to a polygraph examination because there was no reasonable suspicion that he had committed theft; and (8) that Corporal Gardner's dismissal was barred by the doctrine of res judicata. The judgment is affirmed.

 This court views the evidence in the light most favorable to the decision of the administrative agency, drawing all reasonable inferences therefrom. *Becker v. Dept. of Corr. & Human Serv.*, 780 S.W.2d 72, 76 (Mo.App.1989). On January 14, 1991, Corporal Gardner visited Wright Studio and Camera Shop in Jefferson City, Missouri. After departing, he realized that he had left his jacket at the store, so Corporal Gardner returned to retrieve it.

Approximately fifteen minutes prior to Corporal Gardner's second visit to the camera store, an employee, William E. Morrison, arrived for his shift, carrying a $289 light meter belonging to the camera shop. Mr. Morrison placed the light meter on a used equipment counter.

When Corporal Gardner returned for his jacket, he placed it over the light meter and asked Mr. Morrison to check the prices of coking filters at a different counter. By the time Mr. Morrison returned, Corporal Gardner had draped the jacket over his arm. Corporal Gardner did not purchase the filters, but left the store. Shortly thereafter, Mr. Morrison realized the light meter was missing. Store employees testified that no

other customers were near the used equipment counter at the time that the light meter disappeared.

Mr. Morrison telephoned Corporal Gardner to ascertain whether he knew anything about the missing light meter. Corporal Gardner claimed that two women had been near the used equipment counter while he was in the store, although none of the employees had seen them in that area. Corporal Gardner later returned to the store a third time, to buy chemical bottles. According to testimony, he seemed nervous and asked employees about the missing meter.

On January 16, 1991, Zeal Wright of Wright Studio and Camera Shop contacted Lieutenant Frank Burkhead, a member of the Missouri Highway Patrol, regarding the incident. Lieutenant Burkhead then conveyed information concerning the missing light meter to Lieutenant Kenneth R. Ledbetter, a member of the Division of Professional Standards of the Patrol, the following day. Upon the advice of Lieutenant Colonel B.D. Smith, the Assistant Superintendent of the Patrol, Lieutenant Ledbetter investigated the situation, interviewing personnel at the camera shop.

On the afternoon of January 17, 1991, Lieutenant Burkhead and Lieutenant Ledbetter met with Lieutenant Colonel Smith and Colonel Fisher to discuss the incidents surrounding the missing meter. Colonel Fisher was apprised that Corporal Gardner had been in the camera store, that he had placed his coat on the light meter, that he had been the only customer near the light meter, and that the light meter was missing shortly after he left. Colonel Fisher was also informed that Corporal Gardner later returned to the store in a nervous state, after employees telephoned him regarding the disappearance.

Colonel Fisher asked Lieutenant Burkhead to visit Corporal Gardner at his home to look for the missing meter. During the visit, Corporal Gardner showed Lieutenant Burkhead his photographic equipment, but Lieutenant Burkhead was unable to locate the meter.

On the morning of January 18, 1991, Lieutenant Burkhead met with Colonel Fisher, Lieutenant Colonel Smith, Lieutenant Ledbetter and Captain White. Lieutenant Burkhead stated that he had not viewed the missing meter. Nonetheless, Colonel Fisher authorized a polygraph examination to be conducted on Corporal Gardner.

Corporal Gardner was called to the Professional Standards Division for questioning on January 19, 1991. Captain White and Lieutenant Ledbetter handled the interview. Corporal Gardner was told that they were conducting a criminal investigation, and he was read his Miranda rights. Corporal Gardner then requested to speak with an attorney. After Corporal Gardner's lawyers arrived, he was questioned, and he discussed his visits to Wright Studio and Camera Shop. During the questioning, Captain White specifically requested that Corporal Gardner take a polygraph examination, but Corporal Gardner refused on the advise of counsel.

■ Later during the questioning, Corporal Gardner was notified that, instead of conducting a criminal investigation, the Patrol would conduct "strictly an internal investigation," and he was given a *Garrity* warning.[1] Captain White then renewed his request for Corporal Gardner to take a polygraph examination. Corporal Gardner continued to refuse on the advise of counsel, stating that he understood formal charges could be drawn against him for the failure to submit to such an examination.

Later that same day, Lieutenant Thomas J. Halford also ordered Corporal Gardner to take a polygraph examination and again explained that if he refused, formal charges for dismissal could be filed. Based on the advise of counsel, however, Corporal Gardner persisted in refusing the polygraph examination.

1. A *Garrity* warning is a statement intended to advise a public employee that any statements made or evidence obtained from any such statements which are required as a condition of continued employment can be used against the employee only in an investigation by the employer of such employee's performance of his or her public trust and cannot be used against the employee in a criminal prosecution. Such warning resulted from the decision in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), as discussed under point II.

Corporal Gardner again acknowledged that he understood this refusal could result in his dismissal.

Finally, on January 25, 1991, Lieutenant Gene Vaughn, the Acting Troop Commander, ordered Corporal Gardner to submit to the examination. Lieutenant Vaughn also apprised Corporal Gardner that he would be the subject of formal charges if he refused to cooperate. Corporal Gardner nonetheless declined to submit to the polygraph examination.

On January 30, 1991, the Patrol informed Corporal Gardner that formal charges had been filed against him for insubordination and for failure to obey the order of a superior. The day after receiving this notice, Corporal Gardner privately arranged to have Dr. Carroll Price administer a polygraph examination. Corporal Gardner did not inform the Patrol that he was taking the examination, nor did he reveal his passing results until the day of the hearing on the charges.

The Board convened on February 8, 1991 to hear his case. After considering all the evidence, the Board recommended Corporal Gardner's dismissal. Colonel Fisher issued the decision of the agency by terminating Corporal Gardner's employment with the Patrol through a letter dated February 15, 1991. Corporal Gardner filed a Petition for Review of Agency Decision in the Circuit Court of Cole County, Missouri.

On November 25, 1991, the circuit court reviewed the agency decision, finding that the Patrol "acted beyond [its] authority in terminating Appellant Gardner because Colonel Fisher failed to read the entire record, including all evidence" presented at the Board hearing before terminating Corporal Gardner's employment. The court reversed the decision and remanded it to the Patrol. No further hearings were conducted by the Patrol, but on December 19, 1991, Colonel Fisher again ordered Corporal Gardner's dismissal, this time after having read the entire record, including all the evidence.

Corporal Gardner then filed a second Petition for Judicial Review of Agency Decision, claiming that the circuit court's November 25, 1991 order conclusively determined that he should be reinstated, in that it "reversed and held for naught" his dismissal. The Circuit Court of Cole County, however, affirmed the dismissal, and Corporal Gardner appeals.

■ Although the circuit court affirmed Corporal Gardner's termination, this court reviews only the findings and decision of the administrative agency, not the holding of the circuit court. *Biggs v. Missouri Com'n on Human Rights,* 830 S.W.2d 512, 515 (Mo. App.1992). "Review is limited to a determination of whether the decision was in excess of agency jurisdiction, supported by competent and substantial evidence on the whole record, or whether the decision rendered was arbitrary, capricious or unreasonable." *Kabir v. Dept. of Social Services,* 782 S.W.2d 706, 707–08 (Mo.App.1989) (quoting *Welty v. Bd. of Chiropractic Examiners,* 759 S.W.2d 295, 297–98 (Mo.App.1988)).

I.

■ In his first point on appeal, Corporal Gardner focuses on the statutory provisions of § 43.150, RSMo 1986, which outline the procedure for removal or discipline of members of the Highway Patrol. Section 43.150, RSMo 1986, reads, in pertinent part:

[T]he members of the patrol shall be subject to removal only for cause ... upon a finding by a majority of a board of five members appointed by the superintendent. The board shall be composed of one captain, one lieutenant, one sergeant, one patrolman, and one other member of the patrol, of the same rank as the accused member, if there is a member of equivalent rank, *at least three of whom must be of the same political party as the accused member.*[2]

(Emphasis added). Corporal Gardner argues that the Highway Patrol and Colonel C.E. Fisher "acted in excess of their authority" in dismissing him because "the record

2. The legislature amended § 43.150 in 1992, deleting the requirement that at least three Board members be of the same political party as the accused. However, since Mr. Gardner's hearing took place in 1991, this case is bound by the earlier version of the statute.

does not establish that the board appointed to hear this case was composed of at least three (3) members of the same political party as Corporal Gardner as mandated by Section 43.150, RSMo."

According to Corporal Gardner, the significance of this alleged failure to make a showing of compliance with § 43.150, RSMo 1986, is that when an administrative agency fails to adhere to the relevant statutory requirements, it loses subject-matter jurisdiction and its decision becomes void. *State v. Mo. Health Facilities Rev. Com.*, 768 S.W.2d 559, 562–63 (Mo.App.1988), *overruled on other grounds by West Cty. Care Ctr. v. Review Committee*, 773 S.W.2d 474, 476–77 (Mo.App. 1989); *Williams v. Marcus*, 652 S.W.2d 893, 894 (Mo.App.1983). Corporal Gardner contends that the Highway Patrol's alleged failure to show compliance with § 43.150, RSMo 1986, amounted to a failure to establish jurisdiction, as the jurisdiction of an administrative agency must affirmatively appear in its own record. *State v. Wilson*, 332 S.W.2d 867, 871 (Mo.1960).

■ As a threshold matter, we note that a violation of a statutory provision by an adjudicatory body does not always constitute an act in excess of its jurisdiction. *State ex rel. Morasch v. Kimberlin*, 654 S.W.2d 889, 892 (Mo. banc 1983); *State ex rel. Hayter v. Griffin*, 785 S.W.2d 590, 593 (Mo.App.1990). However, there is no need to address the issue of jurisdiction on its merits, as Corporal Gardner's claim that the Highway Patrol failed to show compliance is refuted by the record.

During the hearing by the disciplinary review board on February 8, 1991, the chairman announced, "This board was created pursuant to Section 43.150, Revised Statutes of Missouri, and General Order V–16, 463, Item 11." Then, in a letter to Corporal Gardner, dated February 13, 1991, Colonel Fisher enclosed his final endorsement of the disciplinary review board's report. In that endorsement, Colonel Fisher stated that "[t]he Board in this case was properly constituted pursuant to § 43.150, RSMO, *in all respects*." (Emphasis added). The chairman's announcement at the hearing, as well as Colonel Fisher's assertion that the Board

complied with § 43.150 "in all respects" are unequivocal confirmations in the record that the Board met the statutory requirement governing the political affiliation of its members.

Point one is denied.

## II.

■ Corporal Gardner next argues that Colonel Fisher and the Patrol acted without lawful authority in terminating him for refusing to submit to a polygraph examination because Corporal Gardner had not been granted immunity sufficient to supplant his privilege against self-incrimination. Corporal Gardner claims that he was never advised that the results of a polygraph examination would not be used against him in a criminal proceeding and that it was unlawful for him to be terminated for refusing to submit to such an examination.

Initially, the Patrol told Corporal Gardner that the results of his lie detector test could be used in any proceeding, including a criminal one, and he was read his Miranda rights. Once he invoked his right against self-incrimination, however, the Patrol decided to pursue only an internal investigation. The Patrol then read Corporal Gardner the following *Garrity* Warning:

> I wish to advise you that you are being questioned as part of an official investigation of the Highway Patrol. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself. I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Highway Patrol. *If you do answer, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any*

*subsequent criminal proceeding.* However- er, these statements may be used against you in relation to subsequent departmental charges.

(Emphasis added).

Corporal Gardner asserts that the *Garrity* warning does not apply to polygraph exami- nations per se, but only to traditional "ques- tions." He also points to the fact that the Patrol told him the polygraph examination "may be used as evidence in *any* proceed- ing." (Emphasis added). Corporal Gardner therefore believed that the polygraph's po- tential use encompassed criminal proceedings as well as internal hearings. Without ade- quate assurances that he was immune from the use of the polygraph in a criminal pro- ceeding, Corporal Gardner claims that the Patrol was legally estopped from discharging him for failure to comply with the examina- tion.

Before specifically discussing the connec- tion between polygraph examinations and the privilege against self-incrimination, it is nec- essary to address self-incrimination in the general context of employer questioning. The benchmark case on this subject is *Garri- ty v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity,* police officers were suspected of fixing traffic tick- ets. *Id.* at 494, 87 S.Ct. at 617, 17 L.Ed.2d at 564. During an investigation of the alleged crimes, officers were warned (1) that any- thing they said might be used against them in a criminal proceeding, (2) that they had the right not to answer a question on the basis that it might incriminate them, but (3) that any refusal to answer investigatory questions would subject the officers to termi- nation. *Id.* The United States Supreme Court held that this practice was unconstitu- tional, since the Fourteenth Amendment pre- cluded one from forcing a public employee to choose between self-incrimination and job forfeiture. *Id.* at 500, 87 S.Ct. at 620, 17 L.Ed.2d at 567.

█ Nonetheless, the *Garrity* decision does not necessarily stop public authorities from demanding that their employees answer questions in an investigation. "[T]he state may compel the employee to testify ... if it provides the employee with immunity suffi- cient to supplant the privilege against self- incrimination. Use immunity, which entails the suppression of any statements or their fruits in a criminal prosecution, adequately replaces the constitutional privilege." *Brown v. City of North Kansas City,* 779 S.W.2d 596, 597–98 (Mo.App.1989). Although nei- ther prosecutors nor judges may grant such immunity, it arises as a matter of law once an employee is given a *Garrity*-type warning. *Id.* at 598–99.

> [A] public employer, who has adequately advised a public employee that nothing he says and no evidence obtained from his statement may be used against him in a criminal prosecution, may properly dismiss that employee for refusing to respond to questions about that employee's perfor- mance of his public trust.

*Id.* at 600.

Turning to Corporal Gardner's situation, it is asserted that the Patrol's *Garrity* warning did not adequately inform Corporal Gardner whether the results of his polygraph exami- nation could be used in a criminal proceed- ing. Corporal Gardner argues that the warning referred only to traditional "ques- tions," and that he "responded to all ques- tions openly and fully."

This is essentially a federal constitutional question. Although there appear to be no Missouri cases addressing the application of *Garrity* to the administration of a polygraph examination, several federal appellate courts have confronted this matter.

In *Hester v. City of Milledgeville,* 777 F.2d 1492 (11th Cir.1985), firefighters were the subjects of an internal investigation to deter- mine whether they were involved in illegal drug activity. *Id.* at 1494. The fire chief announced that they would be required to participate in a polygraph examination, and several firefighters claimed that such a con- dition violated their privilege against self- incrimination. *Id.* Although the city did not affirmatively grant the firefighters use im- munity, the court held that, under *Garrity,* "the results of a mandatory polygraph exami- nation cannot be used in a criminal proceed- ing against the subject even absent an explic- it grant of use immunity.... [Instead,] the

privilege against self-incrimination affords a form of use immunity which, absent waiver, automatically attaches to compelled incriminating statements as a matter of law." *Id.* at 1496.

In coming to this conclusion, the court stated, "We recognize that the *Garrity* line of cases did not deal with polygraph testing. As far as the privilege against self-incrimination is concerned, however, we can discern no constitutional difference between polygraph testing and other forms of compelled testimony." *Id.* at 1495, n. 6.

Likewise, in *Gulden v. McCorkle,* 680 F.2d 1070 (5th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439, (1983) public employees were discharged for refusing to submit to polygraph examinations, although they did not receive an affirmative tender of immunity. *Id.* at 1071. The court held that the employees might be entitled to specific assurances of immunity during the course of the examination, but that such assurances were otherwise automatic, provided the employees did not waive immunity. *Id.* at 1075. As in *Hester,* the *Gulden* court did not draw a distinction between polygraph questioning and the traditional questioning considered in *Garrity.*

■ *Hester* and *Gulden* are more lenient than the Missouri case of *Brown,* since *Brown* limited its holding to situations wherein a public employer affirmatively notifies its employee that neither his or her statements, nor any evidence derived as fruits of those statements, can be used in a criminal trial. *See Brown,* 779 S.W.2d at 600. Nonetheless, *Hester* and *Gulden* are helpful because they reveal that, contrary to Corporal Gardner's assertion, polygraph examinations are subject to the same sort of *Garrity* analysis used in conventional questioning. A use immunity would have attached to statements made by Corporal Gardner in the course of a polygraph examination, as a matter of law.

Corporal Gardner's further argument that he did not receive adequate assurances of such immunity prior to his refusal to submit to the polygraph examination is without merit. The *Garrity* warning read to Corporal Gardner stated, "If you do answer [ques-

tions,] neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceeding." Polygraph examinations are, by nature, a series of questions, the fruit of which purportedly establishes one's truthfulness or dishonesty. *See* Black's Law Dictionary 1160 (6th Ed.1990). As such, they logically fall under the *Garrity* assurances read to Corporal Gardner by the Patrol. Any belief by Corporal Gardner that the polygraph questioning was excluded from the protection of *Garrity* is unreasonable.

Furthermore, in addition to reading the *Garrity* warning, the Patrol specifically told Corporal Gardner that the results of the lie detector test could not be used to incriminate him:

White: If, if the department says ... this is strictly an internal investigation, then, yea [sic], you don't have any choice. You have to answer our questions.... If we say we want you to take a polygraph or drug test ... you have to submit to those things. But, the results of those cannot be used in any criminal proceedings....

Gardner: Use it against me within the department even though not against me in [a] criminal case.

White: Sure, that's right. Yea [sic], and that's the whole purpose of it, is, is [sic] it's internal. Uh, it can be used, uh, you know if you took the polygraph and failed it, ... [y]ou can't go to the courthouse and try them for a crime based on that because they had no right to refuse it, they had to submit to it so that's why there's a distinction.

This explanation sets forth a clear definition of the criminal use immunity to which Corporal Gardner would have been entitled, had he taken the lie detector test. Captain White also explained to Corporal Gardner's counsel that the polygraph examination was strictly for purposes of an internal investigation and the results would not be made available to civil authorities for prosecution.

Corporal Gardner asserts, however, that he was confused because the Patrol also read

him General Order V–16–463, Section IV–E, which states, "A member or civilian employee *who is the subject of an internal investigation* may be directed to submit to a ... polygraph ... examination.... The results of [this test] ... may be used as evidence in *any* proceeding." (Emphasis added). In isolation, this statement might cause the listener to form an erroneous belief that information derived from polygraph examinations would be admissible in criminal trials. However, Captain White distinctly explained to Corporal Gardner that polygraph results would be forbidden in criminal trials, provided one was forced to submit to a lie detector test as part of an internal investigation. Because General Order V–16–463 specifically concerned internal investigations, Corporal Gardner could not have reasonably misconstrued its language. Taken in context, the clear meaning of the General Order is that the results of the test may be used as evidence in any *administrative* proceeding.

Corporal Gardner was provided with use immunity to replace his privilege against self-incrimination, and he was adequately advised of such immunity. Point denied.

### III.

■ In his third point, Corporal Gardner argues that it was unreasonable, arbitrary and capricious for the Patrol to order him to submit to a polygraph examination because Missouri courts have found them to be unreliable. Corporal Gardner relies heavily on *State v. Biddle*, 599 S.W.2d 182 (Mo. banc 1980), in making this assertion.

In *Biddle*, the Missouri Supreme Court held that, despite the defendant's stipulation that the results could be introduced by either side at trial, "[t]he results of polygraph examinations are inadmissible as evidence in a criminal trial because they lack scientific support for their reliability," *Id.* at 185. Corporal Gardner contends that polygraph examinations are impermissible, not only in criminal trials, but also in internal administrative investigations.

This argument was specifically rejected in *State ex rel. Bernsen v. City of Florissant*, 641 S.W.2d 477 (Mo.App.1982) and *Campbell v. Personnel Bd. of Kansas City*, 666 S.W.2d

806 (Mo.App.1984). In *Bernsen*, a police officer was discharged for failure to obey an order to take a polygraph examination in connection with an administrative investigation. *Bernsen*, 641 S.W.2d at 478–79. The officer argued that his discharge was unwarranted because the order to submit to a polygraph examination was unreasonable and unlawful. *Id.* at 479. The court affirmed, stating:

> Although the results of a polygraph are inadmissible in court, use of a polygraph for investigative purposes and (because of public acceptance) as a means of clearing the reputation of the police after a charge of misconduct, has been recognized by the courts. There is no basis for a finding that the Chief's order was unlawful.

*Id.* at 480 (citations omitted).

Likewise, in *Campbell*, two city employees were discharged for refusing to submit to a polygraph examination during an administrative investigation regarding missing property. *Campbell*, 666 S.W.2d at 807–08. The employees argued that their termination was arbitrary, capricious and unreasonable because, under *Biddle*, polygraph test results are inadmissible in criminal trials. *Id.* at 809. The court held that *Biddle* does not prohibit the use of polygraph testing during investigations or for uses relative to employment, however. *Id.* at 809. Therefore, dismissal based on a refusal to cooperate in the polygraph stage of a lawful investigation was not arbitrary, capricious or unreasonable. *Id.* at 809–11.

Corporal Gardner's argument is without merit. Point three is denied.

### IV.

■ Corporal Gardner contends as his fourth point on appeal that he was never lawfully requested or ordered to submit to a polygraph examination. Accordingly, the Board's findings are arbitrary and capricious insomuch as they declare (1) that he consistently refused to submit to a lawfully requested polygraph examination and (2) that he disobeyed a direct order of his superior.

In support of his position, Corporal Gardner relies on a military case, *U.S. v. Wine*, 28

M.J. 688 (A.F.C.M.R.1989). In *Wine,* the court stated that a lawful order must be:

(1) *reasonably in furtherance of or connected to military needs* (promotes morale, discipline and usefulness of command), (2) *specific as to time and place and definite and certain in describing the act or thing to be done or omitted,* and (3) *not otherwise contrary to established law or regulation.*

*Id.* at 690–91. Corporal Gardner complains that his alleged orders were deficient as to the second *Wine* requirement, because the Patrol never designated a specific date, time or place for him to take a polygraph examination. Accordingly, Corporal Gardner argues that the polygraph examination administered by Dr. Price should have exonerated him.

First, the sole case relied upon by Corporal Gardner is not binding Missouri law.[3] As a result, Corporal Gardner fails to cite any Missouri cases discussing the requirements of a lawful order, nor does our research reveal any.

Second, the evidence, in the light most favorable to the administrative decision, demonstrates that the Patrol did specify a time, place and date for Corporal Gardner to submit to a polygraph examination. When Corporal Gardner was initially questioned by Lieutenant Ledbetter on January 19, 1991, Lieutenant Ledbetter told Corporal Gardner, that "we contacted Drug and Crime Control and we've got a polygraph examiner available and they're gonna be here about 10:00. And, after we complete taking your statement then we want to verify that through a polygraph examination."

Point four is denied.

## V.

■ In point five, Corporal Gardner claims that the Board made an arbitrary and capricious finding when it determined that he failed to submit to a polygraph examination, and that this finding was not supported by competent and substantial evidence on the whole record. Specifically, Corporal Gardner asserts that the Board disregarded, in its entirety, testimony by Dr. Price indicating that Corporal Gardner did in fact submit to a polygraph examination, even though Dr. Price's testimony was undisputed and unimpeached.

"An administrative agency may not arbitrarily ignore *relevant* evidence not shown to be disbelieved. Only if it makes a specific finding that undisputed or unimpeached evidence is incredible and is unworthy of belief may it disregard such evidence." *Knapp v. Local Govern. Emp. Retire. Sys.,* 738 S.W.2d 903, 913 (Mo.App.1987) (emphasis added).

The Patrol does not argue that Dr. Price's testimony was incredible or unworthy of belief, but instead argues that the testimony was irrelevant. Corporal Gardner, on the other hand, repeats his argument from point four, that the Patrol never appointed a specific time, place or date for him to take a polygraph examination. He claims that Dr. Price's testimony was relevant in that it confirms he eventually complied with the Patrol's wishes.

■ Evidence is relevant when it "tends to prove or disprove a fact in issue or corroborates other relevant evidence which bears on the principal issue." *State ex rel. Webster v. Missouri Resource Recovery, Inc.,* 825 S.W.2d 916, 942 (Mo.App.1992). The principal issue in this case is whether Corporal Gardner in fact disobeyed an order and whether he was guilty of insubordination.

Considering the evidence in the light most favorable to the agency decision, the insubordination and refusal to obey an order occurred well before Corporal Gardner arranged for Dr. Price to administer his polygraph examination on January 31, 1991. Corporal Gardner refused orders to take a polygraph examination on January 19 and 25, 1991.[4] Charges were filed against Corporal

---

3. Although the Patrol calls itself a "quasi-military organization," it is subject to the law of Missouri, not the law of the Federal Air Force. Hence, federal military law does not have stare decisis effect in this case. *See* 20 Am.Jur.2d *Courts* § 225 (1965).

4. For example, on January 25, 1991—six days before Corporal Gardner first visited Dr. Price—

Gardner on January 30, 1991. It was thereafter Dr. Price conducted a polygraph examination on Corporal Gardner. Accordingly, the doctor's testimony was irrelevant in that it neither supported nor weakened any Board finding.

It was unnecessary for the Board to have specifically determined whether Dr. Price was incredible or unbelievable. Regardless, the Board was well within its discretion in determining that Corporal Gardner was guilty of insubordination and failure to obey a direct order.

Point five is denied.

## VI.

■ As his sixth point on appeal, Corporal Gardner claims that the Patrol had no authority to terminate him because Colonel Fisher acted in contravention of § 536.080.2, RSMo 1994. That statute reads, in relevant part:

In contested cases, each official of an agency who renders or joins in rendering a final decision shall, prior to such final decision, either hear all the evidence, read the full record including all the evidence, or personally consider the portions of the record cited or referred to in the arguments or briefs.

At the time he first dismissed Corporal Gardner, Colonel Fisher stated that he had reviewed the transcript of the testimony at the hearing and had considered the Board's findings of fact and conclusions of law. He did not, however, initially read the documentary evidence as required under the statute. Upon review, the circuit court remanded the case to the agency due to this error. Colonel Fisher then reviewed the entire record as required by statute, and reissued a letter of dismissal on December 19, 1991.

Remand is "[t]he act of an appellate court when it sends a case back to the trial court and orders the trial court to conduct limited

he disobeyed Lieutenant Vaughn's order to submit to a polygraph examination. Likewise, during his initial questioning on January 19, 1991—twelve days before meeting with Dr. Price—Corporal Gardner was clearly insubordinate:

> White: And you realize that by . . . refusing [to take a polygraph examination] that that [sic]

new hearings or an entirely new trial, or to take some other further action." Black's Law Dictionary 1293 (6th ed. 1990). Logically then, the purpose of remand is to rectify any error which may have occurred in the lower tribunal. This court finds all error was cured when Colonel Fisher reconsidered Corporal Gardner's case, before issuing the dismissal letter of December 19, 1991. The record indicates that, at that time, Colonel Fisher stated the following:

> At the direction of the court, I have received the entire transcript of the hearing, *reviewing all of the evidence submitted,* and reviewing the Findings of Fact and Conclusions of Law of the Board. I find that the charges are true and sufficiently serious to warrant Corporal Wayne H. Gardner's dismissal.

(Emphasis added). Corporal Gardner received the relief he desired in his original petition for judicial review and the error was rectified on remand. Point six is denied.

## VII.

■ In point seven, Corporal Gardner claims the Patrol had no authority to request or order him to submit to a polygraph examination, because at the time Colonel Fisher authorized administration of the examination, Colonel Fisher did not have sufficient evidence before him to manifest reasonable suspicion that Corporal Gardner had stolen the light meter. Under the Patrol's General Order V–16–463, section IV.E, Corporal Gardner asserts that reasonable suspicion must exist before a patrol member may be directed to take a polygraph examination.

General Order V–16–463 governs complaint procedures and disciplinary rules for members, and reads in pertinent part:

> IV. INVESTIGATION OF COMPLAINT
>
> * * * * * *

you may be brought up on departmental charges strictly on that refusal? . . .

Gardner: I understand that.

White: And you still refuse to take the polygraph?

Gardner: On the advice of counsel I refuse to take the polygraph. . . .

E. A member or civilian employee who is the subject of an internal investigation may be directed to submit to a lineup, photographic lineup, fingerprint, voiceprint, handwriting, polygraph, or medical examination; breath, blood, and urine tests when reasonable suspicion exists; or to provide financial disclosure statements which are specifically directed and narrowly related to such investigation.

Without reasonable suspicion, Corporal Gardner maintains that the order was invalid.

The point can be easily disposed by addressing the issue of reasonable suspicion. For the sake of argument, it is assumed but not found, that reasonable suspicion was required. Reasonable suspicion is the "quantum of knowledge sufficient to induce [an] ordinarily prudent and cautious [person] under [the] circumstances to believe criminal activity is at hand." Black's Law Dictionary 1266 (6th ed. 1990). It must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant ... intrusion." *State v. Muhammad*, 690 S.W.2d 427, 430 (Mo.App.1985) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). The suspicion need not rise to the level of probable cause, however. *State v. Fetterhoff*, 739 S.W.2d 573, 577 (Mo.App.1987).

The facts in Corporal Gardner's case indicate that reasonable suspicion was abundant. When Colonel Fisher authorized Corporal Gardner's lie detector test, Colonel Fisher had been informed that Corporal Gardner had been inside the camera shop three times on the day in question; he was apprised that Corporal Gardner had set his jacket on top of the light meter and, when next seen, had removed the jacket so that it hung over his arm. He was also informed that Corporal Gardner was the only customer near the light meter at the approximate time it disappeared, and that Corporal Gardner had returned to the store, acting very nervous after employees had telephoned him with ques-

tions about the disappearance. These are specific and articulable facts, which, taken together with rational inferences, reasonably suggest that Corporal Gardner was responsible for the theft of the light meter. Reasonable suspicion clearly existed. Point seven is denied.

### VIII.

In his last point on appeal, Corporal Gardner argues that this case is subject to res judicata because, on November 25, 1991, the circuit court reversed the Patrol's decision to terminate Corporal Gardner due to a procedural error. Corporal Gardner asserts that the circuit court's reversal is a conclusive and final judgment which forbids the Patrol from reaffirming Corporal Gardner's dismissal, even after rectifying the procedural defect.

In its order, the circuit court held:

Colonel C.E. Fisher and the Missouri State Highway Patrol acted beyond their authority in terminating Appellant Gardner because Colonel Fisher failed to read the entire record, including all evidence, as required by Section 536.080(2), RSMo.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the decision of the Missouri State Highway Patrol be reversed and held for naught and this matter is remanded to the Missouri State Highway Patrol for proceedings not inconsistent with this Order.

On remand, the Patrol did not hold a new hearing. Colonel Fisher did, however, review the entire record, including all the evidence from the first hearing, as mandated by § 536.080.2. RSMo 1994. Based on this reassessment, Colonel Fisher again ordered Corporal Gardner's dismissal.

Corporal Gardner claims that the Patrol's actions constituted an erroneous manifestation of the circuit court's order, in that the doctrine of res judicata barred Colonel Fisher from redismissing him.[5] According to Corporal Gardner, the only "proceeding" which would have been consistent with

---

5. During his appeal of the Patrol's second order of dismissal, Corporal Gardner presented a Motion for Summary Judgment to the circuit court, in which he made this same argument. The circuit court denied the motion.

the circuit court's order would have been Corporal Gardner's reinstatement.

In making this argument, however, it appears that Corporal Gardner has misconstrued the nature of the circuit court's order in his application of the doctrine of res judicata. Res judicata stands for the proposition that, when two suits concern the same cause of action, the earlier judgment is decisive as to matters actually litigated in the prior action, as well as to matters which could have been raised in the prior action. *Farrow v. Brown*, 873 S.W.2d 918, 920 (Mo.App.1994). The purpose of res judicata is to relieve litigants "of the cost and vexation of multiple lawsuits, conserving judicial resources and encouraging reliance on adjudications." *Hartsfield v. Barkley*, 856 S.W.2d 342, 344 (Mo.App.1993).

Once a final judgment is rendered on the merits, res judicata may apply. *See* 46 Am.Jur.2d *Judgments* § 394 (1969). However, in the case at bar, the circuit court remanded the matter to the Highway Patrol for further proceedings, and the effect of a remand is "to preclude finality for that adjudication, and hence, the effect of res judicata." *Petrie v. LeVan*, 799 S.W.2d 632, 636 (Mo.App.1990).

Thus, in the case at bar, no final judgment resulted from the circuit court's order that the decision of the Patrol "be reversed and held for naught and ... remanded to the Missouri State Highway Patrol for proceedings not inconsistent with this Order." The circuit court did not order that Corporal Gardner be reinstated to his position.[6] *See Gamble v. Hoffman*, 732 S.W.2d 890, 895 (Mo. banc 1987) (holding that a reversal and remand by the court of appeals of the dismissal of a member of the highway patrol did not reinstate such member). Upon remand of the reversal by the circuit court of Corporal Gardner's dismissal on the basis of a procedural error, the Patrol had authority to proceed in accordance with statute, i.e. to correct such error in the proceedings, and to render a new decision.

As such, Corporal Gardner's argument warrants little consideration. It would be paradoxical for a case to obstruct itself from reaching its own completion. This court holds that the doctrine of res judicata is inapplicable. Point denied.

This court affirms Corporal Gardner's dismissal.

All concur.

---

6. This interpretation of the circuit court's ruling on Corporal Gardner's first Petition for Judicial Review of Agency Decision is supported by the fact that the circuit court upheld Colonel Fisher's second decision to dismiss Corporal Gardner, after Colonel Fisher had, upon remand, read the entire record, including all the evidence.