GARRITY ET AL. *v.* NEW JERSEY.

No. 13.  Argued November 10, 1966.—Decided January 16, 1967.

*Daniel L. O'Connor* argued the cause for appellants. With him on the brief was *Eugene Gressman*.

*Alan B. Handler*, First Assistant Attorney General of New Jersey, argued the cause for appellee. With him on the brief were *Arthur J. Sills*, Attorney General, and *Norman Heine*.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Appellants were police officers in certain New Jersey boroughs. The Supreme Court of New Jersey ordered that alleged irregularities in handling cases in the municipal courts of those boroughs be investigated by the Attorney General, invested him with broad powers of inquiry and investigation, and directed him to make a report to the court. The matters investigated concerned alleged fixing of traffic tickets.

Before being questioned, each appellant was warned (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office.[1]

---

[1] "Any person holding or who has held any elective or appointive public office, position or employment (whether state, county or municipal), who refuses to testify upon matters relating to the office, position or employment in any criminal proceeding wherein he is a defendant or is called as a witness on behalf of the prosecution,

Appellants answered the questions. No immunity was granted, as there is no immunity statute applicable in these circumstances. Over their objections, some of the answers given were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Appellants were convicted and their convictions were sustained over their protests that their statements were coerced,[2] by reason of the fact that, if they refused to answer, they could lose their positions with the police department. See 44 N. J. 209, 207 A. 2d 689, 44 N. J. 259, 208 A. 2d 146.

We postponed the question of jurisdiction to a hearing on the merits. 383 U. S. 941. The statute whose validity was sought to be "drawn in question," 28 U. S. C. § 1257 (2), was the forfeiture statute.[3] But the New

upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself or refuses to waive immunity when called by a grand jury to testify thereon or who willfully refuses or fails to appear before any court, commission or body of this state which has the right to inquire under oath upon matters relating to the office, position or employment of such person or who, having been sworn, refuses to testify or to answer any material question upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself, shall, if holding elective or public office, position or employment, be removed therefrom or shall thereby forfeit his office, position or employment and any vested or future right of tenure or pension granted to him by any law of this state provided the inquiry relates to a matter which occurred or arose within the preceding five years. Any person so forfeiting his office, position or employment shall not thereafter be eligible for election or appointment to any public office, position or employment in this state." N. J. Rev. Stat. § 2A:81–17.1 (Supp. 1965).

[2] At the trial the court excused the jury and conducted a hearing to determine whether, *inter alia,* the statements were voluntary. The State offered witnesses who testified as to the manner in which the statements were taken; the appellants did not testify at that hearing. The court held the statements to be voluntary.

[3] N. 1, *supra.*

Jersey Supreme Court refused to reach that question (44 N. J., at 223, 207 A. 2d, at 697), deeming the voluntariness of the statements as the only issue presented. *Id.*, at 220–222, 207 A. 2d, at 695–696. The statute is therefore too tangentially involved to satisfy 28 U. S. C. § 1257 (2), for the only bearing it had was whether, valid or not, the fear of being discharged under it for refusal to answer on the one hand and the fear of self-incrimination on the other was "a choice between the rock and the whirlpool" [4] which made the statements products of coercion in violation of the Fourteenth Amendment. We therefore dismiss the appeal, treat the papers as a petition for certiorari (28 U. S. C. § 2103), grant the petition and proceed to the merits.

We agree with the New Jersey Supreme Court that the forfeiture-of-office statute is relevant here only for the bearing it has on the voluntary character of the statements used to convict petitioners in their criminal prosecutions.

The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession under *Chambers* v. *Florida,* 309 U. S. 227, and related cases can be "mental as well as physical"; "the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn* v. *Alabama,* 361 U. S. 199, 206. Subtle pressures (*Leyra* v. *Denno,* 347 U. S. 556; *Haynes* v. *Washington,* 373 U. S. 503) may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his "free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California,* 314 U. S. 219, 241.

We adhere to *Boyd* v. *United States,* 116 U. S. 616, a civil forfeiture action against property. A statute offered

---

[4] *Stevens* v. *Marks,* 383 U. S. 234, 243, quoting from *Frost Trucking Co.* v. *Railroad Comm'n,* 271 U. S. 583, 593.

the owner an election between producing a document or forfeiture of the goods at issue in the proceeding. This was held to be a form of compulsion in violation of both the Fifth Amendment and the Fourth Amendment. *Id.,* at 634–635. It is that principle that we adhere to and apply in *Spevack* v. *Klein, post,* p. 511.

The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda* v. *Arizona,* 384 U. S. 436, 464–465, is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion [5] inherent in this scheme of questioning

---

[5] Cf. Lamm, The 5th Amendment and Its Equivalent in Jewish Law, 17 Decalogue Jour. 1 (Jan.–Feb. 1967):

"It should be pointed out, at the very outset, that the Halakhah does not distinguish between voluntary and forced confessions, for reasons which will be discussed later. And it is here that one of the basic differences between Constitutional and Talmudic Law arises. According to the Constitution, a man cannot be compelled to testify against himself. The provision against self-incrimination is a privilege of which a citizen may or may not avail himself, as he wishes. The Halakhah, however, does not permit self-incriminating testimony. It is inadmissible, even if voluntarily offered. Confession, in other than a religious context, or financial cases completely free from any traces of criminality, is simply not an instrument of the Law. The issue, then, is not compulsion, but the whole idea of legal confession.

.     .     .     .     .

"The Halakhah, then, is obviously concerned with protecting the confessant from his own aberrations which manifest themselves, either as completely fabricated confessions, or as exaggerations of the real facts. . . . While certainly not all, or even most criminal confessions are directly attributable, in whole or part, to the Death Instinct, the Halakhah is sufficiently concerned with the minority

and cannot be sustained as voluntary under our prior decisions.

It is said that there was a "waiver." That, however, is a federal question for us to decide. *Union Pac. R. R. Co. v. Pub. Service Comm.,* 248 U. S. 67, 69–70; *Stevens* v. *Marks,* 383 U. S. 234, 243–244. The Court in *Union Pac. R. R. Co.* v. *Pub. Service Comm., supra,* in speaking of a certificate exacted under protest and in violation of the Commerce Clause, said:

> "Were it otherwise, as conduct under duress involves a choice, it always would be possible for a State to impose an unconstitutional burden by the threat of penalties worse than it in case of a failure to accept it, and then to declare the acceptance voluntary . . . ." *Id.,* at 70.

Where the choice is "between the rock and the whirlpool," duress is inherent in deciding to "waive" one or the other.

> "It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." *Ibid.*

---

of instances, where such is the case, to disqualify all criminal confessions and to discard confession as a legal instrument. Its function is to ensure the total victory of the Life Instinct over its omnipresent antagonist. Such are the conclusions to be drawn from Maimonides' interpretation of the Halakhah's equivalent of the Fifth Amendment.

"In summary, therefore, the Constitutional ruling on self-incrimination concerns only forced confessions, and its restricted character is a result of its historical evolution as a civilized protest against the use of torture in extorting confessions. The Halakhic ruling, however, is much broader and discards confessions in toto, and this because of its psychological insight and its concern for saving man from his own destructive inclinations." *Id.,* at 10, 12.

In that case appellant paid under protest. In these cases also, though petitioners succumbed to compulsion, they preserved their objections, raising them at the earliest possible point. Cf. *Abie State Bank* v. *Bryan,* 282 U. S. 765, 776. The cases are therefore quite different from the situation where one who is anxious to make a clean breast of the whole affair volunteers the information.

Mr. Justice Holmes in *McAuliffe* v. *New Bedford,* 155 Mass. 216, 29 N. E. 517, stated a dictum on which New Jersey heavily relies:

> "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him. On the same principle, the city may impose any reasonable condition upon holding offices within its control." *Id.,* at 220, 29 N. E., at 517–518.

The question in this case, however, is not cognizable in those terms. Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee.

We held in *Slochower* v. *Board of Education,* 350 U. S. 551, that a public school teacher could not be discharged merely because he had invoked the Fifth Amendment privilege against self-incrimination when questioned by a congressional committee:

> "The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of

guilt or a conclusive presumption of perjury. . . . The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Id.*, at 557–558.

We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.

There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. Engaging in interstate commerce is one. *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1. Resort to the federal courts in diversity of citizenship cases is another. *Terral* v. *Burke Constr. Co.,* 257 U. S. 529. Assertion of a First Amendment right is still another. *Lovell* v. *City of Griffin,* 303 U. S. 444; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Thomas* v. *Collins,* 323 U. S. 516; *Lamont* v. *Postmaster General,* 381 U. S. 301, 305–306. The imposition of a burden on the exercise of a Twenty-fourth Amendment right is also banned. *Harman* v. *Forssenius,* 380 U. S. 528. We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

*Reversed.*

[For dissenting opinion of Mr. Justice White, see *post,* p. 530.]

Mr. Justice Harlan, whom Mr. Justice Clark and Mr. Justice Stewart join, dissenting.

The majority opinion here and the plurality opinion in *Spevack* v. *Klein, post,* p. 511, stem from fundamental misconceptions about the logic and necessities of the

constitutional privilege against self-incrimination. I fear that these opinions will seriously and quite needlessly hinder the protection of other important public values. I must dissent here, as I do in *Spevack*.

The majority employs a curious mixture of doctrines to invalidate these convictions, and I confess to difficulty in perceiving the intended relationships among the various segments of its opinion. I gather that the majority believes that the possibility that these policemen might have been discharged had they refused to provide information pertinent to their public responsibilities is an impermissible "condition" imposed by New Jersey upon petitioners' privilege against self-incrimination. From this premise the majority draws the conclusion that the statements obtained from petitioners after a warning that discharge was possible were inadmissible. Evidently recognizing the weakness of its conclusion, the majority attempts to bring to its support illustrations from the lengthy series of cases in which this Court, in light of all the relevant circumstances, has adjudged the voluntariness *in fact* of statements obtained from accused persons.

The majority is apparently engaged in the delicate task of riding two unruly horses at once: it is presumably arguing simultaneously that the statements were involuntary as a matter of fact, in the same fashion that the statements in *Chambers* v. *Florida,* 309 U. S. 227, and *Haynes* v. *Washington,* 373 U. S. 503, were thought to be involuntary, and that the statements were inadmissible as a matter of law, on the premise that they were products of an impermissible condition imposed on the constitutional privilege. These are very different contentions and require separate replies, but in my opinion both contentions are plainly mistaken, for reasons that follow.

## I.

I turn first to the suggestion that these statements were involuntary in fact. An assessment of the voluntariness of the various statements in issue here requires a more comprehensive examination of the pertinent circumstances than the majority has undertaken.

The petitioners were at all material times policemen in the boroughs of Bellmawr and Barrington, New Jersey. Garrity was Bellmawr's chief of police and Virtue one of its police officers; Holroyd, Elwell, and Murray were police officers in Barrington. Another defendant below, Mrs. Naglee, the clerk of Bellmawr's municipal court, has since died. In June 1961 the New Jersey Supreme Court *sua sponte* directed the State's Attorney General to investigate reports of traffic ticket fixing in Bellmawr and Barrington. Subsequent investigations produced evidence that the petitioners, in separate conspiracies, had falsified municipal court records, altered traffic tickets, and diverted moneys produced from bail and fines to unauthorized purposes. In the course of these investigations the State obtained two sworn statements from each of the petitioners; portions of those statements were admitted at trial. The petitioners were convicted in two separate trials of conspiracy to obstruct the proper administration of the state motor traffic laws, the cases being now consolidated for purposes of our review. The Supreme Court of New Jersey affirmed all the convictions.

The first statements were taken from the petitioners by the State's Deputy Attorney General in August and November 1961. All of the usual indicia of duress are wholly absent. As the state court noted, there was "no physical coercion, no overbearing tactics of psychological persuasion, no lengthy incommunicado detention, or efforts to humiliate or ridicule the defendants." 44 N. J.

209, 220, 207 A. 2d 689, 695. The state court found no evidence that any of the petitioners were reluctant to offer statements, and concluded that the interrogations were conducted with a "high degree of civility and restraint." *Ibid.*

These conclusions are fully substantiated by the record. The statements of the Bellmawr petitioners were taken in a room in the local firehouse, for which Chief Garrity himself had made arrangements. None of the petitioners were in custody before or after the depositions were taken; each apparently continued to pursue his ordinary duties as a public official of the community. The statements were recorded by a court stenographer, who testified that he witnessed no indications of unwillingness or even significant hesitation on the part of any of the petitioners. The Bellmawr petitioners did not have counsel present, but the Deputy Attorney General testified without contradiction that Garrity had informed him as they strolled between Garrity's office and the firehouse that he had arranged for counsel, but thought that none would be required at that stage. The interrogations were not excessively lengthy, and reasonable efforts were made to assure the physical comfort of the witnesses. Mrs. Naglee, the clerk of the Bellmawr municipal court, who was known to suffer from a heart ailment, was assured that questioning would cease if she felt any discomfort.

The circumstances in which the depositions of the Barrington petitioners were taken are less certain, for the New Jersey Supreme Court found that there was an informal agreement at the Barrington trial that the defendants would argue simply that the possibility of dismissal made the statements "involuntary as a matter of law." The defense did not contend that the statements were the result of physical or mental coercion, or that the wills of the Barrington petitioners were overborne. Accordingly, the State was never obliged to offer evidence

of the voluntariness in fact of the statements. We are, however, informed that the three Barrington petitioners had counsel present as their depositions were taken. Insofar as the majority suggests that the Barrington statements are involuntary in fact, in the fashion of *Chambers* or *Haynes,* it has introduced a factual contention never urged by the Barrington petitioners and never considered by the courts of New Jersey.

As interrogation commenced, each of the petitioners was sworn, carefully informed that he need not give any information, reminded that any information given might be used in a subsequent criminal prosecution, and warned that as a police officer he was subject to a proceeding to discharge him if he failed to provide information relevant to his public responsibilities. The cautionary statements varied slightly, but all, except that given to Mrs. Naglee, included each of the three warnings.[1] Mrs. Naglee was

---

[1] The warning given to Chief Garrity is typical. "I want to advise you that anything you say must be said of your own free will and accord without any threats or promises or coercion, and anything you say may be, of course, used against you or any other person in any subsequent criminal proceedings in the courts of our state.

"You do have, under our law, as you probably know, a privilege to refuse to make any disclosure which may tend to incriminate you. If you make a disclosure with knowledge of this right or privilege, voluntarily, you thereby waive that right or privilege in relation to any other questions which I might put to you relevant to such disclosure in this investigation.

"This right or privilege which you have is somewhat limited to the extent that you as a police officer under the laws of our state, may be subjected to a proceeding to have you removed from office if you refuse to answer a question put to you under oath pertaining to your office or your function within that office. It doesn't mean, however, you can't exercise the right. You do have the right."

A. "No, I will cooperate."

Q. "Understanding this, are you willing to proceed at this time and answer any questions?"

A. "Yes."

not told that she could be removed from her position at the court if she failed to give information pertinent to the discharge of her duties. All of the petitioners consented to give statements, none displayed any significant hesitation, and none suggested that the decision to offer information was motivated by the possibility of discharge.

A second statement was obtained from each of the petitioners in September and December 1962. These statements were not materially different in content or circumstances from the first. The only significant distinction was that the interrogator did not advert even obliquely to any possibility of dismissal. All the petitioners were cautioned that they were entitled to remain silent, and there was no evidence whatever of physical or mental coercion.

All of the petitioners testified at trial, and gave evidence essentially consistent with the statements taken from them. At a preliminary hearing conducted at the Bellmawr trial to determine the voluntariness of the statements, the Bellmawr petitioners offered no evidence beyond proof of the warning given them.

The standards employed by the Court to assess the voluntariness of an accused's statements have reflected a number of values, and thus have emphasized a variety of factual criteria. The criteria employed have included threats of imminent danger, *Payne* v. *Arkansas,* 356 U. S. 560, physical deprivations, *Reck* v. *Pate,* 367 U. S. 433, repeated or extended interrogation, *Chambers* v. *Florida,* 309 U. S. 227, limits on access to counsel or friends, *Crooker* v. *California,* 357 U. S. 433, length and illegality of detention under state law, *Haynes* v. *Washington,* 373 U. S. 503, individual weakness or incapacity, *Lynumn* v. *Illinois,* 372 U. S. 528, and the adequacy of warnings of constitutional rights, *Davis* v. *North Carolina,* 384 U. S. 737. Whatever the criteria employed, the duty of the Court has been "to examine the entire

record," and thereby to determine whether the accused's will "was overborne by the sustained pressures upon him." *Davis* v. *North Carolina*, 384 U. S. 737, 741, 739.

It would be difficult to imagine interrogations to which these criteria of duress were more completely inapplicable, or in which the requirements which have subsequently been imposed by this Court on police questioning were more thoroughly satisfied. Each of the petitioners received a complete and explicit reminder of his constitutional privilege. Three of the petitioners had counsel present; at least a fourth had consulted counsel but freely determined that his presence was unnecessary. These petitioners were not in any fashion "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion . . . ." *Miranda* v. *Arizona*, 384 U. S. 436, 461. I think it manifest that, under the standards developed by this Court to assess voluntariness, there is no basis for saying that any of these statements were made involuntarily.

## II.

The issue remaining is whether the statements were inadmissible because they were "involuntary as a matter of law," in that they were given after a warning that New Jersey policemen may be discharged for failure to provide information pertinent to their public responsibilities. What is really involved on this score, however, is not in truth a question of "voluntariness" at all, but rather whether the condition imposed by the State on the exercise of the privilege against self-incrimination, namely dismissal from office, in this instance serves in itself to render the statements inadmissible. Absent evidence of involuntariness in fact, the admissibility of these statements thus hinges on the validity of the consequence which the State acknowledged might have resulted if the statements had not been given. If the consequence is

constitutionally permissible, there can surely be no objection if the State cautions the witness that it may follow if he remains silent. If both the consequence and the warning are constitutionally permissible, a witness is obliged, in order to prevent the use of his statements against him in a criminal prosecution, to prove under the standards established since *Brown* v. *Mississippi,* 297 U. S. 278, that as a matter of fact the statements were involuntarily made. The central issues here are therefore identical to those presented in *Spevack* v. *Klein, supra:* whether consequences may properly be permitted to result to a claimant after his invocation of the constitutional privilege, and if so, whether the consequence in question is permissible. For reasons which I have stated in *Spevack* v. *Klein,* in my view nothing in the logic or purposes of the privilege demands that all consequences which may result from a witness' silence be forbidden merely because that silence is privileged. The validity of a consequence depends both upon the hazards, if any, it presents to the integrity of the privilege and upon the urgency of the public interests it is designed to protect.

It can hardly be denied that New Jersey is permitted by the Constitution to establish reasonable qualifications and standards of conduct for its public employees. Nor can it be said that it is arbitrary or unreasonable for New Jersey to insist that its employees furnish the appropriate authorities with information pertinent to their employment. Cf. *Beilan* v. *Board of Education,* 357 U. S. 399; *Slochower* v. *Board of Education,* 350 U. S. 551. Finally, it is surely plain that New Jersey may in particular require its employees to assist in the prevention and detection of unlawful activities by officers of the state government. The urgency of these requirements is the more obvious here, where the conduct in question is that of officials directly entrusted with the administration of justice. The importance for our systems of jus-

508

tice of the integrity of local police forces can scarcely be exaggerated. Thus, it need only be recalled that this Court itself has often intervened in state criminal prosecutions precisely on the ground that this might encourage high standards of police behavior. See, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143; *Miranda* v. *Arizona, supra.* It must be concluded, therefore, that the sanction at issue here is reasonably calculated to serve the most basic interests of the citizens of New Jersey.

The final question is the hazard, if any, which this sanction presents to the constitutional privilege. The purposes for which, and the circumstances in which, an officer's discharge might be ordered under New Jersey law plainly may vary. It is of course possible that discharge might in a given case be predicated on an imputation of guilt drawn from the use of the privilege, as was thought by this Court to have occurred in *Slochower* v. *Board of Education, supra.* But from our vantage point, it would be quite improper to assume that New Jersey will employ these procedures for purposes other than to assess in good faith an employee's continued fitness for public employment. This Court, when a state procedure for investigating the loyalty and fitness of public employees might result either in the *Slochower* situation or in an assessment in good faith of an employee, has until today consistently paused to examine the actual circumstances of each case. *Beilan* v. *Board of Education, supra; Nelson* v. *Los Angeles County,* 362 U. S. 1. I am unable to see any justification for the majority's abandonment of that process; it is well calculated both to protect the essential purposes of the privilege and to guarantee the most generous opportunities for the pursuit of other public values. The majority's broad prohibition, on the other hand, extends the scope of the privilege beyond its essential purposes, and seriously hampers the protection of other important values. Despite the majority's

disclaimer, it is quite plain that the logic of its prohibitory rule would in this situation prevent the discharge of these policemen.  It would therefore entirely forbid a sanction which presents, at least on its face, no hazard to the purposes of the constitutional privilege, and which may reasonably be expected to serve important public interests.  We are not entitled to assume that discharges will be used either to vindicate impermissible inferences of guilt or to penalize privileged silence, but must instead presume that this procedure is only intended and will only be used to establish and enforce standards of conduct for public employees.[2]  As such, it does not minimize or endanger the petitioners' constitutional privilege against self-incrimination.[3]

---

[2] The legislative history of N. J. Rev. Stat. 2A:81–17.1 provides nothing which clearly indicates the purposes of the statute, beyond what is to be inferred from its face.  In any event, the New Jersey Supreme Court noted below that the State would be entitled, even without the statutory authorization, to discharge state employees who declined to provide information relevant to their official responsibilities.  There is therefore nothing to which this Court could properly now look to forecast the purposes for which or circumstances in which New Jersey might discharge those who have invoked the constitutional privilege.

[3] The late Judge Jerome Frank thus once noted, in the course of a spirited defense of the privilege, that it would be entirely permissible to discharge police officers who decline, on grounds of the privilege, to disclose information pertinent to their public responsibilities.  Judge Frank quoted the following with approval:

" 'Duty required them to answer.  Privilege permitted them to refuse to answer.  They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers.  They claim that they had a constitutional right to refuse to answer under the circumstances, but . . . they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them.'  Christal v. Police Commission of San Francisco."  Citing 33 Cal. App. 2d 564, 92 P. 2d 416.  (Emphasis added by Judge Frank.)  United States v. Field, 193 F. 2d 92, 106 (separate opinion).

I would therefore conclude that the sanction provided by the State is constitutionally permissible. From this, it surely follows that the warning given of the possibility of discharge is constitutionally unobjectionable. Given the constitutionality both of the sanction and of the warning of its application, the petitioners would be constitutionally entitled to exclude the use of their statements as evidence in a criminal prosecution against them only if it is found that the statements were, when given, involuntary in fact. For the reasons stated above, I cannot agree that these statements were involuntary in fact.

I would affirm the judgments of the Supreme Court of New Jersey.