The PEOPLE of the State of Colorado, Petitioner,

v.

**Joel SAPP, Respondent.**

The PEOPLE of the State of Colorado, Petitioner,

v.

**Hershel BLACKFORD, Respondent.**

Nos. 96SC84, 96SC85.

Supreme Court of Colorado,
En Banc.

March 31, 1997.

---

Peter F. Michaelson, District Attorney, Fifth Judicial District, Todd H. Barson, Deputy District Attorney, Breckenridge, for Petitioner.

Bruno, Bruno & Colin, P.C., Louis B. Bruno, Paul D. Godec, Denver, for Respondents.

Justice MARTINEZ delivered the Opinion of the Court.

We granted certiorari in these two cases to review the orders of the Lake County District Court affirming orders of a county court suppressing evidence in the prosecutions of two law enforcement officers for False Reporting to Authorities [1] and Second Degree Official Misconduct.[2] The county court concluded that the officers' statements were compelled by the threat of discharge from their employment. We adopt a two-prong test to determine whether statements are compelled by threat of discharge from employment: (1) a person must subjectively believe that he will be fired for asserting the Fifth Amendment privilege against self-incrimination, and (2) that belief must be objectively reasonable under the circumstances. We agree that the law enforcement officers subjectively believed that their statements were compelled, but hold that the record does not support a conclusion that these beliefs were objectively reasonable under the circumstances. We reverse.

I.

In early November, 1994, defendants Joel Sapp, a Leadville police officer, and Hershel Blackford, a Lake County deputy sheriff, responded to reports of a domestic disturbance. Sapp and Blackford contacted a suspect but failed to make an arrest even though the suspect was also violating a restraining order and had two outstanding bench warrants. Instead, they released the suspect and reported that he had fled. Other offenses were committed by the suspect later that evening.

The next night, Sapp and Blackford were called into a meeting by their respective superiors, Leadville Police Chief James Zoller

1. § 18–8–111(1)(c), 8B C.R.S. (1986).

2. § 18–8–405(1)(a), 8B C.R.S. (1986).

and Lake County Acting Sheriff Calvin Dawe, and questioned about the incident. The supervisors asked Sapp and Blackford to prepare written reports. Zoller and Dawe had also asked the district attorney's office to investigate because the incident involved both the sheriff's and police departments, and they believed it was not appropriate for either department to investigate the other. At the time, both Zoller and Dawe contemplated only an internal investigation—they did not intend or anticipate that criminal charges would be filed.

The district attorney filed criminal charges against Sapp and Blackford, based on statements made by them during the course of the internal affairs investigation. The defendants moved to suppress, claiming that the statements were involuntary and in violation of their *Miranda* rights.

The defendants, their superiors, and the district attorney's investigator testified at a consolidated evidentiary hearing on the motions to suppress in county court. Blackford testified that he knew he was not under arrest or in custody when Zoller and Dawe asked him about the incident and told him to write the report. Sapp did not believe he was even being investigated for a criminal matter. Both employees testified that while they understood the meeting with their superiors to be part of an internal investigation, no promises were ever made that the investigation would remain a strictly internal matter or that criminal charges would not be brought. Blackford and Sapp also testified that as law enforcement officers, they felt compelled to follow the orders from their superiors both because of the quasi-military nature of their jobs, and because refusal to do so (by invoking their privilege against self-incrimination) could result in their dismissal for insubordination.

Police Chief Zoller and Acting Sheriff Dawe confirmed that the defendants were not under arrest or in custody during their interview. They also confirmed that while the interview was understood as being part of an internal investigation, no promises were made that the investigation would necessarily stay internal or confidential or that criminal charges would not be brought. They testi-

fied that they had not contemplated the possibility of criminal charges. Zoller and Dawe also testified that they expected the defendants to obey their orders to cooperate by answering questions and writing statements, and that if they were in the defendants' positions, they would have felt obligated to cooperate. Both Zoller and Dawe were asked whether they would have fired their respective employees for refusing to cooperate by invoking the privilege. They acknowledged that refusal to cooperate would have been considered insubordination which could have resulted in discipline. However, neither Zoller nor Dawe stated that he would have actually fired his respective employee for exercising his right to remain silent. Blackford served at the pleasure of the sheriff. Acting Sheriff Dawe testified that while he had the authority to fire Blackford, he would have deferred any discharge decisions to the Lake County Sheriff who at that time was in the hospital. Sapp could only be fired by the Leadville City Council after a due process hearing. Police Chief Zoller testified that while he might have recommended firing Sapp for his underlying misconduct, he would not have recommended firing Sapp for exercising his right to remain silent.

Sapp's attorney introduced evidence of a police department policy manual which stated that an employee shall be immediately informed of his constitutional rights if it is determined that he may be charged with a criminal offense and that internal affairs investigation evidence shall be kept in confidence. However, Sapp did not testify that he relied on or was even aware of this policy. Rather, he testified that he was aware of no express or implied promises that his statements could not be used against him in a criminal proceeding.

In its findings of fact and conclusions of law the county court broadly discussed *Miranda* and whether the defendants relied upon promises that statements would be confidential and not used in criminal proceedings. The county court concluded that Blackford and Sapp feared they could lose their jobs had they refused to cooperate with the investigation and invoked their Fifth Amendment right to remain silent. The

county court suppressed Blackford's and Sapp's statements as involuntary and in violation of *Miranda.*

The People filed an interlocutory appeal of these rulings in district court pursuant to Crim. P. 37.1. The district court noted that the county court's suppression orders had "broadly address[ed] *Miranda* issues as well as the express or implied promise issues," but chose to "focus only on the issue of coercion." The district court concluded that Blackford and Sapp believed that they could have been fired for refusing to give statements as asked. The district court also concluded, without discussion, that this belief was reasonable. The district court therefore affirmed the suppression orders. We granted certiorari to determine "whether the respondents' statements during an internal affairs investigation were compelled and therefore inadmissible in their criminal trials."[3]

## II.

The lower courts concluded that Blackford's and Sapp's statements were compelled by the threat of discharge from their employment. We agree with the courts below that Blackford and Sapp subjectively believed that they faced a threat of discharge, but conclude that this belief was not objectively reasonable under the circumstances. We first determine the appropriate analysis for deciding whether statements are compelled by the threat of discharge from employment and then apply that analysis to the case before us.

## A.

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A person may nonetheless voluntarily provide self-incriminating statements.

Fifth Amendment jurisprudence thus often focuses on what circumstances constitute compulsion. The Fifth Amendment doctrine that a threat of discharge from employment may constitute impermissible compulsion has its origins in *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

In *Garrity,* New Jersey police officers were investigated for allegedly fixing traffic tickets. The officers were informed that they could exercise their Fifth Amendment privilege against self-incrimination if they wished, but doing so would cost them their jobs under a New Jersey statute which required all public employees to cooperate with investigations or forfeit their positions. *Id.* at 494, 87 S.Ct. at 617. The officers cooperated with the investigation, but when prosecuted they moved to suppress their statements as involuntary and coerced. The Supreme Court held that the threat of being fired was sufficiently coercive as to undermine the officers' free choice and render their statements involuntary and subject to suppression under the Fifth Amendment. *Id.* at 496–98, 87 S.Ct. at 618–19.

Cases immediately following *Garrity* largely limited the analysis of involuntariness to situations in which a person was confronted with a statute or regulation which would automatically penalize any exercise of the privilege against self-incrimination. *See Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (penalty imposed by statute); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (same); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (penalty imposed by municipal ordinance); *Uniformed Sanitation Men v. Comm'r of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (same). The rule in these "penalty cases" has been summarized as follows:

**3.** As our grant of certiorari suggests, these facts do not present issues of custodial interrogation without *Miranda* warnings or involuntariness due to express or implied promises. Both Blackford and Sapp testified that they were not in custody. They also testified that there were no promises that their statements would not be used in subsequent criminal prosecutions. Although both lower courts discussed *Miranda* and prom-ises of confidentiality, these discussions were part of the lower courts' exploration of the doctrine that statements may be involuntary if compelled by the threat of termination from employment. Given the clear showing in the record that the defendants were not in custody and were not promised anything, we regard the orders below as relying on the fear of termination from employment.

In all of the cases flowing from *Garrity*, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment ...; and (2) there is a statute or municipal ordinance mandating such procedure.

*United States v. Indorato*, 628 F.2d 711, 716 (1st Cir.1980).

The Colorado Court of Appeals followed this line of reasoning in *Cooper v. Civil Serv. Comm'n*, 43 Colo.App. 258, 604 P.2d 1186 (1979). In *Cooper*, a police officer was fired for unnecessarily brandishing a firearm in violation of a police department regulation. The officer declined to make any statement in his own defense during his discharge proceedings. The officer claimed, on appeal, that his discharge violated his privilege against self-incrimination because he might have suffered adverse employment consequences for exercising his right to make a statement in his own defense. The court of appeals rejected the officer's attempt to frame his situation as a *Garrity* violation:

Plaintiff does not claim, and the record does not show, that any direct economic sanction was threatened in an effort by the city to obtain his statement. While it is true that disciplinary action did result in his discharge from the police force, there was no threat of *automatic termination* if he chose not to make the statement provided for by Charter. Thus, *Garrity* is inapposite.

*Id.* at 263, 604 P.2d at 1190 (emphasis added).

The contours of this constitutional analysis were modified by the U.S. Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In *Murphy*, a probationer was required to report to his probation officer periodically and to answer all questions truthfully. The probationer reported to his probation officer that he had committed certain crimes. When criminal charges were brought, the probationer moved to suppress his admissions because he was under a court-ordered obligation to be truthful with his probation officer and he feared that if he were not truthful his probation would be revoked.

The Supreme Court rejected the probationer's attempt to apply the *Garrity* rule to his situation. The Supreme Court began by noting that the Fifth Amendment privilege against self-incrimination is generally not self-executing. When a person does not invoke the right against self-incrimination and chooses to answer questions, "his choice is considered voluntary since he was free to claim the privilege and would suffer no penalty as a result of his decision to do so." 465 U.S. at 429, 104 S.Ct. at 1143.

The Court then considered whether the probationer would have been penalized for exercising his right to remain silent under the circumstances. The Court rejected the argument that the probationer's legal compulsion to meet with and truthfully answer all the questions of his probation officer denied the probationer his free choice to remain silent. The Court held that such compulsion is indistinguishable from that felt by any witness who is required to appear and give truthful testimony in a judicial proceeding upon pain of contempt. Such situations are not considered compulsive in a way which undermines free choice, and a person in such a situation must claim the privilege or his statements will be deemed voluntary. *Id.* at 427–29, 104 S.Ct. at 1142–43.

The Court also rejected the probationer's claim that he could have suffered the penalty of probation revocation had he exercised his Fifth Amendment privilege in response to his probation officer's questions. While acknowledging that revocation of probation might be a sufficient penalty to trigger a *Garrity* analysis, the Court stated that its precedents plainly forbade the revocation of probation as a penalty for the legitimate exercise of a constitutional right. *Id.* at 438, 104 S.Ct. at 1148.

In construing the probationer's situation, the Court did not limit its analysis to the existence of statutes or regulations which would have automatically revoked probation. The Court also considered whether a probationer could reasonably expect to suffer the penalty of probation revocation for asserting the privilege in the absence of such statutes

or regulations. *Id.* at 437–39, 104 S.Ct. at 1147–49. The Supreme Court thus suggested that *Garrity*'s penalty analysis applies not only to situations where the penalty is automatically imposed by statute or ordinance, but also where a defendant honestly and reasonably believes that assertion of the privilege will be penalized. *E.g., id.* at 437, 104 S.Ct. at 1148 ("Whether we employ a subjective or an objective test, there is no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination."), 439, 104 S.Ct. at 1148 ("Accordingly, we cannot conclude that Murphy was deterred from claiming the privilege by a reasonably perceived threat of revocation.").

Courts interpreting *Murphy*'s effect on *Garrity* and its progeny have adopted a two-prong test in penalty cases: in order for statements to be considered compelled by threat of discharge, (1) a person must subjectively believe that he will be fired for asserting the privilege, and (2) that belief must be objectively reasonable under the circumstances. *See United States v. Friedrick,* 842 F.2d 382, 395 (D.C.Cir.1988) ("Under the *Garrity—Lefkowitz—Murphy* line of authority, Friedrick must have in fact believed his January statements to be compelled on threat of loss of job and this belief must have been objectively reasonable."); *United States v. Najarian,* 915 F.Supp. 1460, 1478–79 (D.Minn.1996); *United States v. Camacho,* 739 F.Supp. 1504, 1515 (S.D.Fla.1990); *State v. Connor,* 124 Idaho 547, 861 P.2d 1212, 1213 (1993); *State v. Lacaillade,* 266 N.J.Super. 522, 630 A.2d 328, 331 (App.Div.1993).

The objective prong of this two-part test requires further analysis because the protections of the Fifth Amendment are not triggered by all coercive situations. "The sole concern of the Fifth Amendment ... is governmental coercion." *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (citing *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977); *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966)). Accordingly, courts applying *Garrity* in non-automatic

penalty situations have emphasized that ordinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge. Rather, in order for a law enforcement officer's subjective belief that he might be fired to be considered objectively reasonable for purposes of *Garrity* immunity, it must be supported by some demonstrable action of the state.

In *United States v. Camacho,* 739 F.Supp. 1504 (S.D.Fla.1990), police officers were interviewed as witnesses to an incident in which a suspect died while in police custody. The officers' decision to cooperate with the investigation was influenced by a city ordinance which provided for discipline for insubordination and by the advice they had received from private counsel. The attorney advised the officers to participate in the investigation because they could be fired for refusing to cooperate and because their participation would give them *Garrity* immunity from subsequent criminal prosecution.

The court held that neither of these factors was sufficient by itself to support an objectively reasonable belief that invoking the privilege would be punished by termination. The ordinance which commanded an employee to follow the directions of a superior or suffer discipline for insubordination was no more coercive than the general obligation to give testimony upon pain of contempt. *Camacho,* 739 F.Supp. at 1517 (citing *Murphy,* 465 U.S. at 435–39, 104 S.Ct. at 1146–49). Nor did the advice of counsel that the officers would be protected by *Garrity* immunity suffice to bring the officers within the protection of *Garrity.* Otherwise, the court reasoned, the advice of private counsel could essentially confer immunity absent any state action. *Camacho,* 739 F.Supp. at 1518.

In construing the two-part threat of discharge test articulated in *Friedrick,* the court in *Camacho* emphasized that an objectively reasonable belief must have some nexus with state action in order to trigger the Fifth Amendment concerns of *Garrity:*

> In light of the facts of this case, we underscore that a necessary prerequisite to concluding that a subjective belief is objective-

ly reasonable is that the belief be derived from actions taken by the state. A subjective belief that *Garrity* applies will not be considered objectively reasonable if the state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment.

*Camacho,* 739 F.Supp. at 1515 (citations omitted). In *Camacho,* other factors satisfied this nexus requirement and made the officers' beliefs objectively reasonable. *Id.* at 1518.

Other courts applying the two-part test from *Friedrick* have similarly held that a police officer's subjective belief that asserting the privilege will result in discharge is not objectively reasonable absent some action of the state which justifies the belief. In *State v. Connor,* 124 Idaho 547, 861 P.2d 1212 (1993), a police officer moved to suppress statements he had made during an internal investigation of misconduct for which he was subsequently prosecuted. The officer testified that he gave statements at the internal investigation because he was ordered to do so by his superiors, and because he feared he might be fired for refusing. *Id.* 861 P.2d at 1213. The Idaho Supreme Court held that in the absence of any statute, policy, rule or regulation concerning the effect of non-cooperation, the officer only subjectively believed that he might be fired for asserting the privilege. In order for this belief to be considered objectively reasonable, there must be some evidence of record other than the officer's own testimony that he thought he would lose his job. *Id.; accord State v. Lacaillade,* 266 N.J.Super. 522, 630 A.2d 328, 332 (App. Div.1993) (general possibility of dismissal for disobeying orders did not make police officer's subjective belief that he would be fired for refusing to cooperate in internal investigation objectively reasonable).

■ We adopt the two-prong test of *Friedrick,* 842 F.2d at 395, and hold that statements are compelled by threat of discharge from employment where (1) a person subjectively believes that he will be fired for asserting the Fifth Amendment privilege, and (2) that belief is objectively reasonable under the circumstances. Whether a subjec-

tive belief that a person will be terminated from employment for asserting the Fifth Amendment privilege is objectively reasonable under the circumstances is an issue of law. In order for such a belief to be objectively reasonable the belief must result from some significant coercive action of the state. The action of the state must be more coercive than that resulting from the general obligation imposed on a witness to give truthful testimony. *See Camacho,* 739 F.Supp. at 1515.

### B.

■ We now apply this two-prong test to the case before us. Both Blackford and Sapp testified that they personally feared they would be fired if they had refused to cooperate with the investigation. The county court found this testimony credible, and it plainly satisfies the subjective component of our analysis. The issue to be resolved is whether this subjective belief was objectively reasonable under the circumstances.

The county court concluded that Blackford and Sapp believed that they could be discharged because they were law enforcement officers who were subject to discipline for refusing to answer questions relating to the performance of their official duties. The district court affirmed this finding, and held without discussion that this belief was reasonable. The record does not support the conclusion that Blackford's and Sapp's beliefs that they could be fired were objectively reasonable under the circumstances because there was no state action which contributed to these subjective beliefs.

Blackford and Sapp both testified that the reason they feared they might be fired was that refusing to cooperate would have been insubordination which could have subjected them to discipline, up to and including discharge. Neither offered any other reason for their fear of termination. They both testified that they were never told that they would be fired for noncooperation, and were not aware of any statute or ordinance which would have jeopardized their jobs for asserting the privilege. Both Acting Sheriff Dawe and Police Chief Zoller testified that there

was no automatic penalty statute. Neither Dawe nor Zoller testified that he would have fired his respective employee for asserting the privilege.

The evidence that Blackford and Sapp faced discharge for asserting the privilege is their own testimony that they believed they could be fired for refusing to cooperate and the testimony of their superiors that were they in Blackford's and Sapp's shoes, they would have felt compelled to cooperate. The testimony of the superior officers that they would have felt compelled to cooperate does not meet the objective test we have announced. A mere subjective belief that termination will result is not objectively reasonable, as a matter of law, even if it is shared by others. The state must have played a significant role in creating the impression that Blackford and Sapp might be discharged for asserting the privilege for their beliefs to be considered objectively reasonable. To be significant, the state's role in creating such beliefs must have been more coercive than the requirement that a witness testify truthfully. *See Camacho*, 739 F.Supp. at 1515; *Connor*, 861 P.2d at 1213–14; *Lacaillade*, 630 A.2d at 332; *see also United States v. Najarian*, 915 F.Supp. 1460, 1479 & n. 26 (D.Minn.1996) (refusing to apply *Garrity* in the absence of a privilege-waiving statute, regulation, ordinance, rule, or some other "operative mandate that required the interrogee to allow official questioning, or face a job termination"). Because no action of the various law enforcement agencies involved played a significant role in creating the subjective beliefs of Blackford and Sapp, the defendants did not have an objectively reasonable fear of termination from employment. The statements may not be suppressed as involuntary under *Garrity*, its progeny, and the two-prong analysis we have adopted.

### III.

We reverse the decisions of the district court affirming the county court orders suppressing the statements at issue. We return this case to the district court with directions to reverse the orders of the county court suppressing evidence and to remand to the county court for further proceedings consistent with this opinion.