The PEOPLE of the State of Colorado,
Plaintiff–Appellant.

v.

Gary KOVERMAN, Defendant–Appellee.

No. 01SA210.

Supreme Court of Colorado,
En Banc.

Jan. 14, 2002.

Edward J. Rodgers, District Attorney, Special Prosecutor, Eleventh Judicial District, C.M. Barton, Deputy District Attorney, Salida, CO, Attorneys for Plaintiff–Appellant.

Colleen B. Scissors, Grand Junction, CO, Attorney for Defendant–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

In this case, the People appeal a trial court's order suppressing defendant Gary R. Koverman's statements in a prosecution against Koverman for, among other things, possession of a schedule I controlled substance,[1] issuing a false certificate,[2] obtaining

1.  § 18–18–405(1)(a), 6 C.R.S. (2001).

2.  § 18–8–406, 6 C.R.S. (2001).

a controlled substance by fraud and deceit,[3] and tampering with physical evidence.[4] *See* C.A.R. 4.1. The trial court found that the statements were the product of coercion through threat of loss of employment. As a matter of law, such a finding must be predicated on evidence: (1) that the defendant subjectively believes that his employer will dismiss him for asserting his Fifth Amendment privilege; and (2) that such belief is objectively reasonable under the circumstances. *People v. Sapp*, 934 P.2d 1367, 1368 (Colo.1997). While Koverman may have held a subjective belief that he would be terminated absent cooperation in responding to questions, we deem the evidence in the record insufficient to support a finding that such a belief was objectively reasonable under the circumstances. Therefore, we reverse the trial court's order of suppression.

I.

Koverman held a position with the Colorado Bureau of Investigation (CBI) as a laboratory analyst. On March 6, 2000, Dennis Mooney, Agent in Charge of the Montrose CBI office, received a telephone call from an anonymous individual who reported that Koverman was using the drug methylenedioxymethamphetamine ("ecstasy"). On March 9, Mooney received a second telephone call from the same individual, who identified himself as Vance Patterson. Patterson repeated the allegation that Koverman was using ecstasy.[5] After the initial telephone call from Vance Patterson, Mooney contacted Deputy Director of the CBI, Peter Mang. Mang assigned Robert Sexton, Agent in Charge of the Denver CBI office, to investigate Patterson's assertions. On March 20, Sexton arranged to submit ninety-nine ecstasy pills to Koverman for laboratory analysis. Following Koverman's analysis, Kevin Humphreys, lead laboratory agent of the Montrose Office, together with Mooney, examined the pills and

discovered that eight pills were missing. Koverman had not indicated either in his notes or in his report the whereabouts of the missing evidence. Based on his experience, Humphreys believed that utilizing eight pills for testing was suspicious because typically the testing procedure would consume only a portion of one tablet.

Shortly after 5:00 p.m. on March 20, Mooney told everyone in the office to "go ahead and close up" so he could set the alarms. Koverman, Humphreys, and Mooney took the elevator together from the third floor to the first floor. As they were leaving the building, Sexton joined the group and, after some small talk, asked Koverman, "Where's the dope?" Koverman asserted that all the pills had been consumed in testing. Sexton requested that they go back into the building. When they entered the building, the door locked behind them.[6] Inside the building, Sexton asked Koverman if he would consent to a search of his person; Koverman consented. Sexton emptied Koverman's pockets, taking his wallet, his badge, and his credentials. However, Sexton did not locate the pills. Sexton then requested that Koverman return to the CBI offices where Koverman consented to a search of his workstation and his office. Koverman assisted in the search, and the agents did not find any pills. Sexton then asked Koverman if he would consent to a strip search, to which Koverman agreed. Again, the search did not reveal the missing pills. Sexton subsequently returned to Koverman's workstation and located seven ecstasy tablets and some powder at the back of a drawer, however, Koverman was not immediately informed of the discovery of the ecstasy.

Following the discovery of the tablets, in a tape-recorded interview, Sexton informed Koverman that he wished to talk to him about his "possession of dangerous drugs,

**3.** § 18–18–415(1)(a), 6 C.R.S. (2001).

**4.** § 18–8–610(1)(b), 6 C.R.S. (2001).

**5.** At the hearing on the motion to suppress, the trial court addressed issues of fact concerning Patterson's credibility; we do not restate those findings because they are not pertinent to the question before us.

**6.** The agents testified that at no point did Koverman attempt to leave or indicate that he wished to leave; however, they testified that if Koverman had attempted to leave, they would have detained him.

Ecstasy, and Official Misconduct" and advised Koverman of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Koverman indicated that he understood his rights and stated that he wished to talk to the agents, signing a *Miranda* waiver form to that effect. Throughout the first portion of the interview, Koverman maintained that the eight pills were destroyed during the testing process. Sexton asked Koverman if the search of his person had been "all right," and Koverman confirmed that it had been. Sexton then asked, "I also went through your office, do you have a problem with that?" Koverman responded, "No I don't, can't." Koverman also confirmed that he was "fine with" the agents going through his lab coat. Koverman then completed a written statement asserting that the testing process had consumed all eight pills.

After Koverman completed the written statement, Sexton confronted Koverman with the seven ecstasy pills and the remaining powder from the pill Koverman had used for testing purposes. Koverman admitted that the pills were the ecstasy tablets submitted to him for testing and asserted that he had retained the extra seven pills as a testing standard. When asked why he had lied about the destruction of the tablets, Koverman responded, "[W]hen you searched me down there[,] I just felt like I was being zeroed in on." Throughout the remainder of the interview, Koverman insisted that he had retained the pills as a standard.

All three of the CBI agents involved in the interview outranked Koverman. However, none of them had the power to terminate Koverman's employment with the CBI. Further, at no time did any of the CBI agents indicate that Koverman's failure to respond to any of the questions would result in the termination of his employment. Additionally, the evidence reflected that no CBI employee had ever been disciplined by the CBI for asserting his Fifth Amendment privilege to remain silent.

A CBI policies and procedures manual states: "*Statements During Departmental Investigations* [-] If requested to make a statement in the course of an official Bureau investigation, members shall make full, complete and truthful statements." In explaining the policy, Mang testified, "[T]he employee has an opportunity not to answer any questions.... [I]f an employee does answer a question, ... we would hope that it is full and truthful and complete. That is the intention of this policy. Again, their statements are voluntary, and there is no threat of termination." There was no contrary evidence presented at the hearing.

## II.

The trial court found that Koverman's statement was compelled by a subjective belief that asserting his Fifth Amendment privilege would have resulted in the termination of his employment. Further, the trial court determined that Koverman's subjective belief was objectively reasonable under the circumstances. The trial court, using the standard identified by *Sapp*, 934 P.2d at 1373, held that the state did play a substantial role in creating Koverman's belief that he would be terminated for the failure to make a statement. Specifically, it found that all three investigating agents were superior officers; that the CBI agents did not leave Koverman unattended; that Sexton removed Koverman's car keys, service revolver, badge, and credentials during the consensual search; and that all three of the agents were aware of the possibility that theft of drugs could result in criminal charges, but none of them advised Koverman of that possibility. The trial court concluded that the agents' treatment of Koverman during the investigation constituted a demonstrable action by the state of sufficient magnitude to create the impression that the refusal to give a statement would result in termination of employment. On those grounds, the trial court suppressed Koverman's statement.

### A.

■ Whether a person's subjective belief that he will be dismissed from employment for asserting the Fifth Amendment privilege is objectively reasonable under the circumstances is an issue of law. *Sapp*, 934 P.2d at 1373. When reviewing a trial court's suppression order, we defer to its findings of

fact but review its conclusions of law de novo. *People v. Medina*, 25 P.3d 1216, 1223 (Colo. 2001); *People v. Rivas*, 13 P.3d 315, 320 (Colo.2000) ("In the context of a suppression motion, a trial court's findings of historical fact are entitled to deference by a reviewing court, but the trial court's application of legal standards to those facts is treated as a question of law to be reviewed de novo."); *People v. Garcia*, 11 P.3d 449, 453 (Colo.2000) (stating that when an appellate court reviews a trial court's suppression order, it should defer to findings of fact, but review conclusions of law de novo). An appellate court must "ascertain whether the trial court's legal conclusions are supported by sufficient evidence and whether the trial court applied the correct legal standard." *People v. Kazmierski*, 25 P.3d 1207, 1210 (Colo.2001) (quotation marks omitted).

## B.

We assume for these purposes that Koverman did subjectively believe that he would lose his job if he asserted his right to remain silent. However, we focus on whether that belief was objectively reasonable. The People argue that the evidence reflects that: (i) Sexton had informed Koverman of his unconditional right to remain silent and Koverman indicated that he understood that right; (ii) the agents merely requested Koverman's cooperation and never commanded that he provide a statement; (iii) the agents never threatened or implied that Koverman's waiver of his Fifth Amendment privilege was a condition of continued employment; and (iv) no CBI employee had been fired for failure to answer questions. Therefore, the People assert that any belief Koverman had that the CBI would dismiss him for asserting his Fifth Amendment privilege was not objectively reasonable under the circumstances.

The defense counters that the investigating agents' knowledge that theft of the ecstasy tablets could result in criminal charges and failure so to advise Koverman contributed to an objectively reasonable fear of termination. Further, the defense argues that the investigating agents' supervisory or superior positions supported an objective inference that Koverman would be fired if he did not cooperate. Finally, the defense contends that the CBI policy specifying that if a member of the CBI is asked to make a statement during an official Bureau investigation, any statement shall be "full, complete and truthful" was a contributing factor to the objective reasonableness of Koverman's belief.

The controlling case on point is *Sapp*, 934 P.2d 1367. In *Sapp*, supervising law enforcement officials questioned the two defendants in the course of an internal affairs investigation regarding official misconduct. *Id.* at 1369. The district attorney ultimately filed criminal charges and attempted to use the defendants' statements in the prosecution. *Id.* The county court granted a motion to suppress the statements as coerced by fear of termination; the district court, acting as the appellate court, upheld that ruling, and we granted certiorari. *Id.* at 1370. We reversed the order of suppression, and articulated the two-prong test that we here apply. In that case, the evidence supporting an objectively reasonable belief of termination for failure to answer questions was the defendants' supervisors' testimony that they expected the defendants to cooperate by answering questions and writing statements and that if they were in the defendants' positions, they would have felt compelled to cooperate. *Id.* at 1369. Further, the superiors acknowledged that they would have considered a refusal to cooperate insubordination that could have resulted in discipline. *Id.* In finding such evidence insufficient, we noted that

[t]he state must have played a significant role in creating the impression that [defendants] might be discharged for asserting the privilege for their beliefs to be considered objectively reasonable. To be significant, the state's role in creating such beliefs must have been more coercive than the requirement that a witness testify truthfully.

*Id.* at 1374.

In *Sapp*, we applied *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), in which the United States Supreme Court established that a threat of discharge from employment may constitute impermissible compulsion in violation of the

Fifth Amendment. In *Garrity*, the attorney general investigated New Jersey law enforcement officers for allegedly fixing traffic tickets. *Id.* at·494, 87 S.Ct. 616. Prior to questioning, the defendants received a warning that they could exercise their Fifth Amendment right, but that any refusal to cooperate would subject them to removal from office under a New Jersey statute requiring public employees to testify or forfeit their position. *Id.* The United States Supreme Court held that because the defendants were presented with the untenable choice of forfeiting their jobs or incriminating themselves, their statements were coerced rendering them involuntary and subject to suppression under the Fifth Amendment. *Id.* at 497–98, 87 S.Ct. 616.

Further, in *Sapp*, we observed that, even under *Garrity*, the action of the state that produces the requisite objectively reasonable fear of termination must be more coercive than that resulting from the obligation imposed on a witness to provide truthful testimony. *Sapp*, 934 P.2d at 1373 (citing *United States v. Camacho*, 739 F.Supp. 1504, 1515 (S.D.Fla.1990)).

The Supreme Court expanded its *Garrity* analysis in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In *Murphy*, the conditions of the defendant's probation required that he report to his probation officer and answer all questions truthfully. *Id.* at 422, 104 S.Ct. 1136. The defendant made incriminating statements to his probation officer pursuant to which the authorities brought criminal charges. *Id.* at 424, 104 S.Ct. 1136. The defendant moved to suppress his statements asserting that the court-ordered obligation to be truthful with his probation officer constituted coercion because he feared that a failure to tell the truth would result in the revocation of his probation. *Id.* at 425, 104 S.Ct. 1136. The Court held that the general obligation to appear and answer questions truthfully, even on the pain of contempt, did not convert otherwise voluntary statements into compelled admissions. *Id.* at 427, 104 S.Ct. 1136. Noting that the Fifth Amendment is generally not self-executing, the Court emphasized that when a witness under a compulsion to testify

answers questions that both he and the government should reasonably expect to be incriminating, he must invoke the Fifth Amendment or that statement is not compelled. *Id.* at 427–28, 104 S.Ct. 1136.

The Court noted that coercion in these cases consists of a threat "to impose economic or other sanctions capable of forcing the self-incrimination which the Amendment forbids." *Id.* at 434, 104 S.Ct. 1136 (quotation marks omitted). The Court concluded that because the state neither explicitly nor implicitly asserted that invocation of the privilege would lead to revocation of probation, the defendant could not reasonably have feared that assertion of the privilege would result in imposition of the penalty. *Id.* at 435–39, 104 S.Ct. 1136.

■ This court has similarly emphasized that ordinary job pressures, including the possibility of discipline or termination for insubordination, do not support an objectively reasonable fear of dismissal. *Sapp*, 934 P.2d at 1372. Additionally, the mere fact that an employee may have felt compelled to make a statement to his colleagues and superiors as a normal part of his duties is not sufficient to implicate *Garrity*. *Camacho*, 739 F.Supp. at 1521. A law enforcement officer's belief that he faces discharge for asserting his Fifth Amendment privilege is only objectively reasonable where a demonstrable action of the state has created the impression that his refusal to give a statement will result in discharge. *Sapp*, 934 P.2d at 1372–73 (citing *Camacho*, 739 F.Supp. at 1515).

■ Hence, we now apply the test we adopted in *Sapp* to the facts of this case. As in *Sapp*, Koverman was interviewed by supervising officers, although here there were more officers than in *Sapp*. As in *Sapp*, the evidence supports a fear of discipline or·even termination for *insubordination* in refusing to answer questions. The differences between the cases are twofold: first, that the investigating officers in *Sapp* did not contemplate that the investigation would lead to a criminal prosecution and in Koverman's case, they apparently knew that criminal charges might be warranted and did not so advise Koverman; and second, that the investigat-

ing officers searched Koverman's person and workstation, with his consent, and held his badge and keys during that search.

■ We conclude that the distinctions do not comprise the level of state coercion necessary to support objective reasonableness. The investigating agents issued Koverman *Miranda* warnings specifically acknowledging his right to exercise at any time the right to remain silent, and he indicated that he understood that right. The agents never threatened or implied that a refusal by Koverman to make a statement would result in discharge. The CBI policy stating that if an employee is "requested to make a statement in the course of an official Bureau investigation, members shall make full, complete and truthful statements" also does not support an objectively reasonable fear of termination. The United States Supreme Court has made it clear that the Fifth Amendment does not give an accused the right to lie. *Lachance v. Erickson*, 522 U.S. 262, 265–66, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998); *cf. Hoffler v. Colo. Dep't of Corr.*, 27 P.3d 371, 376 (Colo.2001) (holding that "the doctrine of common-law privilege that grants immunity to witnesses in quasi-judicial proceedings does not extend to disciplinary proceedings against a state employee who makes false statements in the course of an official investigation"). The mere requirement that a witness testify truthfully is not sufficiently coercive to create an objectively reasonable belief that termination will be the result of a refusal to answer questions at all. *Sapp*, 934 P.2d at 1374. Here, Mang testified that the policy does not require an employee to make a statement. *See United States v. Indorato*, 628 F.2d 711, 716 (1st Cir.1980) (finding no Fifth Amendment violation where the state police departmental rules provided for the dismissal of any officer who refused to obey the lawful order of superiors but the rules did not state that a refusal on Fifth Amendment grounds to comply with an order to provide self-incriminating statements would result in dismissal). Noting that all statements are voluntary, Mang expressed an expectation that any employee statement would be full, complete, and truthful. He also testified that the CBI has never terminated an employee for exercising his Fifth Amend-

ment rights. The expectation that CBI employees make full, complete, and truthful statements does not require an employee to waive his Fifth Amendment rights, and it does not create a reasonably objective belief that an employee faces termination if he refuses to make a statement.

We note that the removal of Koverman's keys and badge occurred in the course of a consensual search during which the investigating CBI agents emptied the entire contents of Koverman's pockets. The CBI agents never indicated that they were permanently confiscating the keys and badge, or that the removal related to a threat of loss of employment dependent upon Koverman's willingness to cooperate, or that the removal was in any way significant to termination. *Cf. State v. Chavarria*, 130 N.M. 978, 33 P.3d 922, 926–27 (Ct.App.2001) (finding that the defendant had an objectively reasonable fear of termination where, among other factors, defendant's superior officers informed him that his job depended upon him giving a statement to the sheriff and told him to turn in any property issued by the county including badges, clothes, and footwear). Rather, the removal of the keys and badge was a part of the search and did not relate to a threat of termination of employment. Therefore, it did not provide the significant coercive state action necessary to make Koverman's belief objectively reasonable.

In sum, we conclude that the evidence was insufficient to support a finding that Koverman's fear of termination if he asserted his Fifth Amendment privilege during questioning was induced by the state in some way. Hence, such fear was not objectively reasonable.

### III.

Therefore, we reverse the trial court's order granting the defendant's motion to suppress and return this case to the trial court for further proceedings consistent with this opinion.

Justice COATS does not participate.