

# In the Missouri Court of Appeals
## Eastern District
### DIVISION FIVE

| | |
|---|---|
| JOHN CHASNOFF, | Nos. ED101748 and ED101753 |
| Plaintiff/Respondent, | Appeal from the Circuit Court of the City of St. Louis |
| vs. | Honorable Robert H. Dierker, Jr. |
| COL. JOSEPH MOKWA, et al., | |
| Defendants/Appellants, | |
| WENDELL ISHMON, et al., | |
| Plaintiffs/Appellants, | |
| vs. | |
| ST. LOUIS BOARD OF POLICE COMMISSIONERS, et al., | |
| Defendants, | |
| and | |
| JOHN CHASNOFF, | |
| Intervenor Defendant/Respondent. | Filed: April 14, 2015 |

Scalpers sold tickets to the 2006 World Series in apparent violation of a then-existing municipal ordinance. The St. Louis police seized the tickets as evidence. After some of the tickets were used to admit persons to the World Series, some of the citizens from whom police had seized the tickets complained to the police department. The department investigated and disciplined certain police officers for their misconduct in the handling of evidence. John

Chasnoff requested records of the investigation pursuant to Missouri's Sunshine Law. The Circuit Court of the City of St. Louis ordered the production of 59 specific records and awarded attorneys' fees to Chasnoff. Because we conclude that the police officers lack a protectable privacy interest in these records of their substantiated on-the-job police misconduct, we affirm the judgment ordering the records' release. Because the trial court properly awarded attorneys' fees due to a knowing violation of the Sunshine Law, we affirm the award of attorneys' fees.

*Facts and Procedural History*

In early November 2006, a citizen complained to the St. Louis Metropolitan Police Department that his St. Louis Cardinals 2006 World Series baseball tickets were improperly used during the 2006 World Series. The citizen reported that police had confiscated the tickets for illegal scalping, that is, selling the tickets for more than their stated price. The police department's Internal Affairs Division (IAD) investigated. After a news article on the story appeared, a second citizen filed a similar complaint.

When investigating a complaint of misconduct, IAD investigators interview the subject police officer(s). The IAD investigator provides the police officer with the following "advice of rights."

> I wish to advise you that you are being questioned as part of an official investigation of the Police Department. You will be asked questions related and specifically directed to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself. I further wish to advise you that if you refuse to testify or answer questions relating to the performance of your official duties or fitness for duty, you will be subject to department charges which could result in your dismissal from the Police Department. *If you do answer, these statements may be used against you in relation to subsequent departmental charges, but not in any subsequent criminal proceedings.* [I understand that all matters discussed are confidential and that I shall not discuss or communicate any part of these matters to any other person, other than my attorney, without prior written permission from the Command, Internal Affairs.]

(Emphasis added.) The bracketed language is no longer included in the current "advice of rights" form, but was included in the forms presented to the police officers in this case. IAD interviewed each police officer who is a party in this case in investigating the complaints that World Series tickets had been improperly used. IAD investigators presented each police officer with the "advice of rights" quoted above, which is based on *Garrity v. New Jersey*, 385 U.S. 493 (1967). The police department refers to the subsequent interviews as "*Garrity* statements."

The investigation revealed that a number of World Series tickets seized from arrestees were used by other persons and then placed in the evidence storage area of the police department's vice and narcotics division. Of 98 confiscated World Series tickets, 31 tickets were used, and investigators learned that several police officers had allowed family members and friends to use the tickets. At the investigation's conclusion, the police department disciplined 16 police officers, with penalties ranging from written reprimand to suspensions and demotions in rank. IAD found that these police officers failed to obey rules for proper handling of evidence, engaged in conduct unbecoming an officer, or violated department procedures. The trial court found that it did not appear from the record that any of the police officers contested the discipline imposed.

John Chasnoff sought disclosure of the records of any complaints and investigative reports related to the confiscated World Series tickets situation under the Sunshine Law, section 610.010 *et seq.*, RSMo. (2000 & Supp. 2013).[1] Because the police department refused to produce the entire IAD file, Chasnoff filed suit against the Board seeking relief under the Sunshine Law.[2] In June 2010, the trial court entered judgment in Chasnoff's favor based on

---

[1] All statutory references are to RSMo. (2000 & Supp. 2013).
[2] The suit originally named then-police chief Colonel Joseph Mokwa, the Metropolitan Police Department of the City of St. Louis, and the State of Missouri as defendants along with the members of the St. Louis Board of Police Commissioners who were sued individually but in their official capacity. The trial court dismissed the State of

3

section 610.021 of the Sunshine Law, ordering disclosure of the IAD full investigative report arising from the citizen complaint, awarding attorneys' fees to Chasnoff, and assessing a civil penalty. The trial court also allowed Wendall Ishmon and other named and unnamed St. Louis police officers (collectively "the police officers") to intervene in Chasnoff's suit against the Board "for the sole purpose of appealing the [c]ourt's final judgment" because the police officers alleged certain privacy interests in the records that the court had ordered disclosed. The Board announced its intention to comply with the trial court's order and did not appeal the judgment ordering disclosure of the records. However, Chasnoff appealed that part of the trial court's judgment allowing the police officers to intervene for the purpose of appeal. The police officers filed a cross-appeal seeking reversal of the judgment ordering disclosure of the records at issue.

In *Chasnoff v. Board of Police Commissioners*, 334 S.W.3d 147, 152 (Mo. App. E.D. 2011) ("*Chasnoff I*"), this Court held that the trial court erred in granting the police officers' motion to intervene for the purpose of appeal. We observed that a party's claim that a government agency must close records is not a claim under the Sunshine Law, which specifically prohibits such claims in section 610.022.4. *Chasnoff I*, 334 S.W.3d at 152. We continued that such a claim is an independent action that must be based on the assertion of rights under a different statute or constitutional provision.[3] *Id.* Because the police officers neither asserted nor obtained adjudication in the trial court of a claim against the Board alleging violation of their personal privacy and property interests, we held that they could not raise the issue on appeal from the underlying case. *Id.* We reversed that part of the judgment allowing the police officers

---

Missouri as a defendant in January 2008, and dismissed Colonel Mokwa and the Metropolitan Police Department in March 2008.

[3] The police officers' action is "independent" in the sense that it arises from a source other than the Sunshine Law. However, a public employee's independent action asserting a right of privacy and a Sunshine Law action should, whenever possible, be joined to avoid inconsistent judgments and because both cases involve disclosure of the same documents. *See* Rule 52.04.

4

to intervene, and dismissed the cross-appeal. *Id.* We left the trial court's order staying release of the records in place so that the police officers might pursue an independent action concerning their alleged privacy and property rights in the records at issue. *Id.*

Following our decision in *Chasnoff I*, the police officers filed suit in *Ishmon v. St. Louis Board of Police Commissioners* in the Circuit Court of the City of St. Louis to prevent the Board's disclosure of the police officers' personnel and disciplinary records. Chasnoff moved to intervene, and the trial court granted his intervention. Without Chasnoff's participation, the police officers and the Board then entered into a consent judgment whereby the Board agreed not to release the records that the trial court had previously ordered released in Chasnoff's action against the Board. Chasnoff appealed. In *Ishmon v. St. Louis Board of Police Commissioners*, 415 S.W.3d 144 (Mo. App. E.D. 2013), and the companion case of *Chasnoff v. Mokwa*, 415 S.W.3d 152 (Mo. App. E.D. 2013) ("*Chasnoff II*"), decided at the same time, this Court found that Chasnoff's asserted interest and rights in disclosure of the records at issue were never adjudicated in the proceeding and were disregarded without determination by the consent judgment. *Ishmon*, 415 S.W.3d at 151; *Chasnoff II*, 415 S.W.3d at 158-59. We vacated the consent judgment and remanded the causes for adjudication of all parties' interests and rights by one newly-assigned judge. *Ishmon*, 415 S.W.3d at 151; *Chasnoff II*, 415 S.W.3d at 159. The stay order concerning the release of the records at issue remained in effect. *Id.*

On remand, the trial court consolidated the *Chasnoff* and *Ishmon* cases and adjudicated all issues following a bench trial in April 2014. The subject of the police officers' claim for relief consists of 59 documents from the IAD investigation, namely interview transcripts and recordings of the interviews with each of the 19 police officers in the *Ishmon* case, the "advice of rights" form executed by 16 officers, seven officers' consent-to-discipline forms, a computerized

summary of the investigation results covering 16 officers, and IAD administrative reports. Officer Ishmon testified that he wanted the records closed because their disclosure would cause him embarrassment. Officer Menendez testified in a conclusory manner that disclosure would damage the reputation of the individual officers and the department. But no police officer adduced factual evidence that the accusations were false. All other plaintiff police officers agreed that if they were to testify, their testimony would match that of Officers Ishmon and Menendez.

The trial court concluded that the June 2010 *Chasnoff* judgment ordering disclosure of the subject records was a final judgment, not subject to collateral attack by the police officers in their case. The trial court stated that the records are public records subject to disclosure unless the police officers could demonstrate an independent right to compel closure. The court determined that the police officers have no legally cognizable right to privacy that precludes release of the Board's records regarding the investigation and discipline of the police officers for misconduct in the handling of evidence seized incident to the 2006 World Series ticket-scalping arrests. The trial court also found that the Board's entry into the consent judgment with the police officers constituted "a palpable effort to evade the judgment in *Chasnoff*," that Chasnoff's intervention in *Ishmon* was essential to preserve the judgment in *Chasnoff*, and that without intervention, Chasnoff's ability to enforce the earlier judgment ordering disclosure of the records would have been foreclosed. As a result, the court awarded Chasnoff $100,000 in attorneys' fees from the Board. The police officers and the Board appeal.[4,5]

---

[4] Six of the 19 police officers failed to appear for trial, and the court dismissed their claims with prejudice, releasing the records pertaining to those six police officers to Chasnoff and the public at large. No party has appealed the trial court's ruling in that regard.

[5] The trial court entered a stay of its judgment as to the documents from the IAD investigation challenged by the thirteen officers on appeal.

6

The police officers assert on appeal that the trial court erred in concluding that they have no enforceable constitutional, statutory, or common-law right to privacy in disciplinary records pertaining to their official duties. They also argue that the trial court erred in finding that the Board's practice and advice to officers about using their *Garrity* statements only for internal purposes did not amount to a promise of non-disclosure giving rise to a right to privacy.

The Board argues on appeal that the trial court erred in awarding attorneys' fees to Chasnoff for the entirety of the consolidated cases under either the Sunshine Law or the collateral-litigation exception to the American Rule.

### *The Police Officers' Appeal: Ishmon v. St. Louis Board of Police Commissioners*

In reviewing a court-tried case, we will reverse the judgment only if no substantial evidence supports it, the judgment is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

In their first point on appeal, the police officers claim the trial court erred in concluding that they have no enforceable constitutional, statutory, or common-law right to privacy in disciplinary records pertaining to performance of their official duties because Missouri recognizes a police officer's right to privacy in those records when the records are not part of a criminal investigation and recognizes an independent cause of action to enforce that right. They argue that all 59 records at issue constitute personal and private information.

In their petition against the Board, the police officers sought, under section 610.030, a declaration of law and a permanent injunction enjoining the Board from disclosing the personnel records of the police officers, which they alleged the Board lawfully closed under section 610.021 of the Sunshine Law. The police officers asserted that they had a "legally protected privacy interest in their personnel records" as well as "constitutional protections against

7

disclosure of *Garrity* statements under the U.S. and Missouri Constitutions." The police officers sought a declaration to this effect concerning their privacy interest and constitutional protections, as well as a pronouncement that the Board lawfully closed the records at issue and could continue to keep them closed under the Sunshine Law. The police officers did not plead any facts clarifying the nature of information they assert is personal.

The trial court's June 2010 judgment ordered the disclosure of the IAD investigation records based on section 610.021 of the Sunshine Law. The police officers acknowledge that theirs is not a claim under the Sunshine Law. Nonetheless, they contend that they had a legitimate expectation of privacy in records that could be closed by their employer, and in fact were closed for a time under the Sunshine Law. The police officers rely on the definition of "personal information" contained in the Sunshine Law to argue that all 59 of the records in question constitute personal information. Section 610.021(3) of the Sunshine Law defines "personal information" as "information relating to the performance or merit of individual employees." Thus, the police officers argue, the records of the disciplinary investigation of individually identifiable police officers are personal matters in which the officers have a legitimate expectation of privacy.

"The overarching purpose of the Sunshine Law is one of open government and transparency." *Laut v. City of Arnold*, 417 S.W.3d 315, 318 (Mo. App. E.D. 2013). A "public record" is any record, written or electronic, retained by or of any public governmental body. Section 610.010(6); *Laut*, 417 S.W.3d at 319. A public governmental body must make its public records available to the public for inspection and copying. Section 610.023.2; *Laut*, 417 S.W.3d at 319. These records are subject to permissive exemptions listed in Section 610.021. *Id.* Section 610.021 states in relevant part that except to the extent the law otherwise requires

8

disclosure, a public governmental body is authorized to close records concerning the discipline of particular employees when personal information about the employee is discussed or recorded or concerning individually identifiable personnel records. "[T]he exemptions allow the public body to close disciplinary records at its discretion." *Id.* at 321.

"Section 610.021 is 'permissive' because it describes records that *may* be closed." *Chasnoff I*, 334 S.W.3d at 151 (emphasis in original)(citing *Guyer v. City of Kirkwood*, 38 S.W.3d 412, 414 (Mo. banc 2001)). The Sunshine Law does not prohibit the Board from disclosing the records at issue. *Id.* To the contrary, "[n]othing in sections 610.010 to 610.028 shall be construed as to require a public governmental body to hold a closed meeting, record or vote to discuss or act upon any matter." Section 610.022.4. "The Board has always had the authority and discretion to disclose the documents under the Sunshine Law." *Chasnoff I*, 334 S.W.3d at 151. In short, a party's claim that a governmental entity is required to close records is not a claim under the Sunshine Law, which expressly prohibits such claims. *Id.* at 152. Rather, such a claim comprises an independent action based on rights asserted under a different statute or constitutional provision. *Id.*

On remand, the trial court concluded that the June 2010 judgment constituted the law of the case, and that the police officers could not collaterally attack it. The trial court determined that the contested records are public records subject to disclosure unless the police officers could demonstrate an independent right to compel their closure. The trial court considered numerous bases for the police officers' claimed right to privacy compelling closure of the records and discounted all of them. The trial court considered the privilege under *Garrity v. New Jersey*, a constitutional right to privacy in employment records, a common-law right to privacy in

9

Missouri, and any other statutory right to privacy that might be infringed by disclosure of the disputed records.

The trial court first examined the privilege that exists pursuant to *Garrity v. New Jersey*. A limited evidentiary privilege exists to prevent the use of compelled statements in later criminal prosecutions. *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). The U.S. Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in *subsequent criminal proceedings* of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* (emphasis added). *Garrity*, however, recognizes no constitutional right to prevent disclosure to the public of such statements under an open-records law.

Aside from *Garrity*, the police officers have cited no right under any specific constitutional provision that they contend would prevent the public disclosure of the records at issue. The trial court stated that, "[o]n the whole, the [c]ourt is unable to conclude that there is in reality an overarching *constitutional* right to privacy of employment records of public employees. Any right of privacy of public employees would at most extend to purely personal facts (e.g., health history)." (Emphasis in original). "Neither the federal nor the Missouri constitutions expressly provide a right of privacy." *North Kansas City Hosp. Bd. of Trustees v. St. Luke's Northland Hosp.*, 984 S.W.2d 113, 121 (Mo. App. W.D. 1998)(quoting *Cruzan ex rel. Cruzan v. Harmon*, 760 S.W.2d 408, 417 (Mo. banc 1988)). "To the extent a Constitutional right to privacy has been recognized, that right has been extended to protect an *individual's* interest in preventing the disclosure of *personal matters.*" *Id.* (emphasis in original). The trial court reviewed the documents *in camera*, and made no finding about the character of the records. The documents have not been filed with this Court. The police officers have not identified the nature

of the purportedly personal information they claim the records contain. The trial court concluded that, "information regarding a police officer's performance of official duties, including discipline imposed for misconduct involving citizens, is not a *personal matter* subject to constitutional protection." (Emphasis in original). We completely agree.

The trial court also considered the common-law tort of invasion of privacy under Missouri law, and found that the police officers had no recourse there. In *Y.G. v. Jewish Hospital of St. Louis*, the Court identified the elements of the common-law tort of invasion of privacy: (1) publication or publicity, (2) absent any waiver or privilege, (3) of private matters in which the public has no legitimate concern, (4) so as to bring humiliation or shame to a person of ordinary sensibilities. 795 S.W.2d 488, 498-99 (Mo. App. E.D. 1990). The tort of invasion of privacy by public disclosure of a private matter requires that the fact disclosed must be of a private matter, one in which the public has no legitimate concern. *Id.* at 499. Here, the police officers' misconduct in the performance of their official duties is undoubtedly a matter in which the public has a legitimate interest. Therefore, the trial court correctly determined that "the public's legitimate concern in the records at issue precludes deployment of that right [the common-law right to privacy] to conceal those records from the public."

Furthermore, the trial court considered whether the police officers had any other statutory right to prevent disclosure of the records. The trial court observed that "no common law right of privacy can trump the statutory policy declared by the Sunshine Law and expressly recognized by [section] 109.180," which provides, "[e]xcept as otherwise provided by law, all state, county and municipal records kept pursuant to statute or ordinance shall at all reasonable times be open for a personal inspection by any citizen of Missouri. . . ." The trial court determined that only when a statute authorizes closure can a governmental entity withhold official records from a

11

citizen. The police officers point to no statute outside the Sunshine Law—which we have already explained permits closure of records but does not compel it—to support their position.

The police officers rely heavily on *Laut v. City of Arnold*, 417 S.W.3d 315 (Mo. App. E.D. 2013), for the proposition that they are entitled to compel closure of the records in question. The trial court observed that while *Laut* extensively examined the closure of personnel records under the Sunshine Law and the line of demarcation between "investigative reports" and "personnel records," "*Laut* proclaim[ed] no independent right of privacy so as to *compel* closure of employment records." (Emphasis in original). The trial court's assessment is correct. The *Laut* Court determined that if the document at issue in that case was responsive to the plaintiffs' Sunshine Law request, and if it qualified equally as an investigative report under the statutory definition and as a disciplinary or personnel record, then it must be disclosed. 417 S.W.3d at 326. The *Laut* Court continued that portions of the document exempt under subdivisions (3) and (13) of section 610.021 regarding employee performance *may* be withheld. *Id.* at 327 (emphasis added). Nothing in *Laut* compels closure of public records based on the subject's right to privacy.

We need not define the precise contours of a public employee's private, personal information. Here, the police officers have never identified anything even arguably of a purely personal character in the disputed records. We have examined the record on appeal thoroughly.[6] We have found neither pleading nor proof that the records contain any personal or private facts. Rather, this is simply a case of substantiated on-the-job misconduct, namely the misuse of evidence. The police officers who testified at trial identified no reason for preventing the records' disclosure or any damages they would suffer other than their own embarrassment. "The

---

[6] The police officers could have requested the documents from the IAD investigation be filed with this Court for our *in camera* review. Rule 81.12(e). But they did not do so.

12

clear purpose of the Sunshine Law is to open official conduct to the scrutiny of the electorate." *North Kansas City Hosp.*, 984 S.W.2d at 122 (quoting *Hyde v. City of Columbia*, 637 S.W.2d 251, 262 (Mo. App. W.D. 1982)). "The overarching purpose of the Sunshine Law is one of open government and transparency." *Laut*, 417 S.W.3d at 318. The information that the police officers seek to suppress is precisely the type of information that the Sunshine Law operates to open. The police officers have no right under the Sunshine Law, the U.S. or Missouri Constitutions, common law, or Missouri statutes to compel closure of public records regarding the officers' substantiated misconduct in the performance of their official duties. We deny the police officers' first point.

In their second point on appeal, the police officers argue that the trial court erred in finding that the Board's practice of using police officers' compelled *Garrity* statements only for internal discipline and its advice to the police officers that the statements were only for internal use did not amount to a promise of non-disclosure giving rise to a right to privacy.

Each police officer received an "advice of rights" form, which included the following language:

> *[T]hese statements may be used against you in relation to subsequent departmental charges, but not in any subsequent criminal proceedings.* [I understand that all matters discussed are confidential and that I shall not discuss or communicate any part of these matters to any other person, other than my attorney, without prior written permission from the Command, Internal Affairs.]

(Emphasis added). As stated earlier, the current "advice of rights" form no longer contains the bracketed language, but the forms presented to the police officers involved in this case did include it. Each police officer acknowledged receipt of the "advice of rights" form with his signature.

13

The trial court found "that at no time did the IAD investigators promise or represent that the so-called *Garrity* statements would not become public record or would not be disclosed for legitimate purposes. . . . [T]he consistent representation was only that the statement could not be used in any subsequent criminal prosecution." The trial court observed that the oral statements of the IAD investigators regarding the potential use of the police officers' *Garrity* statements did not vary materially from the written "advice of rights" form, which contained no representation that the police department would treat the recorded statements as secret. Notwithstanding the evidence of the police department's custom regarding use and disclosure—or more precisely non-disclosure—of *Garrity* statements, the trial court found that no promises of secrecy were made to the police officers.

Lieutenant Scott Gardner, commander of IAD, testified that separate IAD investigators would conduct separate investigations into alleged misconduct for internal purposes and for purposes of potential criminal prosecution. The investigator looking into potential criminal activity would share information with the IAD officer conducting the internal investigation, but information would never flow the other way, from the internal investigation to the criminal investigation.

Lieutenant Jack Huelsmann, now retired, served as the deputy commander of IAD during the time relevant to this case. He likewise testified that the investigator on the criminal side would share information with the investigator on the internal side, but that the internal investigator would never share information learned through a *Garrity* statement with the criminal investigator. Lieutenant Huelsmann then testified on cross-examination as follows:

> Q. And were any of the plaintiffs [police officers] ever advised that the records would not be disclosed by the police department under the Sunshine Law?
> A. Using that terminology, I don't believe so.

14

Q. In fact, they were just told they would be used for internal purposes and not used for—against them in a criminal prosecution, correct?
A. Yes.
Q. And nothing else one way or the other?
A. Yes.

Officer Wendell Ishmon testified that when he gave his statement, the police department advised him the statement would be used only for internal purposes. On cross-examination, Officer Ishmon testified:

Q. Weren't you told that the statements would not be used against you in a subsequent criminal proceeding, a *Garrity* statement?
A. I was told that my statement would be kept within the police department.
Q. And who told you that?
A. It's on the form that I signed.
Q. All right.
A. That it would be used internally.

The form to which Officer Ishmon refers is the "advice of rights" form, which provides that the statements may be used against him in relation to subsequent departmental charges, but not in subsequent criminal proceedings. The form emphasizes that *the officer* is to keep the matters discussed confidential. All of the other police officers agreed that if they were to testify, their testimony would match that of Officer Ishmon.

The evidence reveals that the Board's custom and practice was to decline to share any information learned through *Garrity* statements. The evidence also establishes that the police officers were informed that their statements would be used for only internal purposes, and correspondingly that their *Garrity* statements could not be used against them for purposes of subsequent criminal prosecution. We agree with the trial court, however, that at no time were the officers told that their *Garrity* statements would not be disclosed for legitimate purposes, such as pursuant to a Sunshine Law request or court order. "Use immunity" entails the suppression of any statements or their fruits *in a criminal prosecution*, and adequately replaces

15

the constitutional privilege against self-incrimination. *Gardner v. Mo. State Highway Patrol Superintendent*, 901 S.W.2d 107, 113 (Mo. App. W.D. 1995)(emphasis added). Use immunity arises as a matter of law once a public employee is given a *Garrity*-type warning. *Id.* Assurances of use immunity—an assurance that a statement will be used only for internal purposes and not for purposes of subsequent criminal prosecution—in no way equates to a promise not to disclose the statement under the Sunshine Law if requested, or ordered by a court, to do so.

The trial court also concluded that "[e]ven if the custom and practice of the Board was to preserve '*Garrity* statements' as confidential, this custom and practice does not create any enforceable rights in the [police officers]. The law of Missouri is found in the statutes and decisions of the courts and not in police department administrative customs."

The police officers contend on appeal that the trial court's finding was not supported by substantial evidence and misapplied the law because the uncontroverted evidence reveals that the police officers were advised that their compelled statements and records were for use only in internal disciplinary proceedings. Thus, the police officers maintain, they had a legitimate expectation of privacy in their individually identifiable personnel records that were not part of any criminal investigation. The police officers characterize the issue not as whether the Board promised not to disclose the records. Rather, they portray the issue as whether the Board promised that the records were for disciplinary use only and thus constituted individually identifiable personnel records regarding discipline in which the police officers had an expectation of privacy under the Sunshine Law, specifically subdivisions (3) and (13) of section 610.021. In short, the police officers argue that the "advice of rights" form each signed assured them that they would be asked questions solely about performance of their official duties or

16

fitness for office. Consequently, each police officer had an expectation that his statements were confidential because the Sunshine Law identifies disciplinary records as "personal information" and because the police department assured the officers that the statements were for internal disciplinary purposes.

The police officers' reliance on the contention that the Board promised the records would be used only for internal disciplinary purposes is misplaced. While the bracketed confidentiality language, which has since been removed from the "advice of rights" form, is less than ideal, it cannot trump the Sunshine Law. We agree with the trial court's determination that "[e]ven if the custom and practice of the Board was to preserve 'Garrity statements' as confidential, this custom and practice does not create any enforceable rights in the [police officers]."

Furthermore, the trial court's June 2010 judgment ordered the disclosure of the IAD investigation records based on section 610.021 of the Sunshine Law, and that issue was not appealed.[7] Section 610.021 states in relevant part:

> Except to the extent disclosure is otherwise required by law, a public governmental body is authorized to close meetings, records and votes, to the extent they relate to the following:
>
> * * *
> (3) Hiring, firing, disciplining or promoting of particular employees by a public governmental body when personal information about the employee is discussed or recorded. . . . As used in this subdivision, the term "personal information" means information relating to the performance or merit of individual employees;
>
> * * *
> (13) Individually identifiable personnel records, performance ratings or records pertaining to employees or applicants for employment, except that this exemption shall not apply to the names, positions, salaries and lengths of service of officers and employees of public agencies once they are employed as such . . . [.]

---

[7] We need not and do not address the Sunshine Law holdings of the 2010 judgment because they were never appealed by any party to the trial court's adjudication of rights under the Sunshine Law.

17

"[T]he[se] exemptions allow the public body to close disciplinary records at its discretion."

*Laut*, 417 S.W.3d at 321. "Section 610.021 is 'permissive' because it describes records that *may* be closed." *Chasnoff I*, 334 S.W.3d at 151 (emphasis in original). The Sunshine Law does not prohibit the Board from disclosing the records at issue. *Id.* To the contrary, "[n]othing in sections 610.010 to 610.028 shall be construed as to require a public governmental body to hold a closed meeting, record or vote to discuss or act upon any matter." Section 610.022.4. "The Board has always had the authority and discretion to disclose the documents under the Sunshine Law." *Chasnoff I*, 334 S.W.3d at 151.

Thus, the police officers' argument that subdivisions (3) and (13) of section 610.021, along with the police department's custom and practice or promise, led them to believe that their *Garrity* statements and other disciplinary records would never be disclosed misses the mark. A belief that statements were for internal use by the police department, and not for criminal prosecutions, does not equate to a promise of secrecy. The police officers may have assumed, or hoped, that their statements would remain secret if used only for internal purposes. But the trial court expressly found that no one from the police department promised the police officers anything more than that the statements would not be used against them in a subsequent criminal prosecution, and we find no evidence to the contrary in the record before us. Thus, such a belief of secrecy was not reasonable on the part of the police officers. And we also agree with the trial court's conclusion that had such a promise been made, it would not create any enforceable rights in the police officers. The police department's administrative practices would not trump the Sunshine Law. We deny the police officers' second point.

*The Board's Appeal: Chasnoff v. Mokwa*

18

In two points on appeal, the Board asserts, first, that the trial court erred in awarding attorneys' fees to Chasnoff for the entirety of the consolidated cases under the Sunshine Law because Chasnoff did not specifically plead or move for attorneys' fees, and because the fee award included fees incurred for Chasnoff's intervention in the separate declaratory-judgment action filed by the police officers against the Board, which did not plead a Sunshine Law violation.

Alternatively, the Board argues in its second point that the trial court erred in awarding attorneys' fees to Chasnoff for the entirety of the consolidated cases under the collateral-litigation exception to the American Rule. The Board contends that: (A) the police officers' action did not constitute collateral litigation by a third party because the police officers were parties to the *Chasnoff* case; (B) the police officers' action in *Ishmon* was not the natural and proximate result of any wrong or breach of duty by the Board because the Court of Appeals recognized in *Chasnoff I* the police officers' right to file their action; and (C) Chasnoff's intervention in the police officers' action was voluntary and not necessarily incurred to protect him from injury.

Chasnoff's 2007 petition requested an award of attorneys' fees. Chasnoff also moved for attorneys' fees in February 2009, and filed a statement of attorneys' fees in June 2014 as ordered by the trial court. The trial court found that the "Board knowingly violated the Sunshine Law in its conduct in regard to the consolidated cases." The trial court cited the Board's entry into the consent judgment with the police officers as "a palpable effort to evade the judgment in *Chasnoff*." The court also noted the Board's "belated disclosure" of parallel criminal and IAD investigatory files and files. The trial court found that Chasnoff's intervention in the police officers' action was essential to preserve the *Chasnoff* judgment, and that without the

19

intervention, Chasnoff's ability to enforce his judgment would have been foreclosed. The trial court concluded as a matter of law that Chasnoff's defense to the police officers' action was part and parcel of his establishment of the Board's knowing violation of the Sunshine Law. As a result of the Board's conduct, the trial court awarded Chasnoff $100,000 in attorneys' fees after reviewing the reasonableness of the hourly rates, total hours expended, success achieved, the complexity of the litigation, and the like related to "vindication of [Chasnoff's] Sunshine Law interests."

Section 610.027.3 provides in relevant part that "[i]f the court finds that there is a knowing violation of sections 610.010 to 610.026, the court may order the payment by such [public governmental] body or member [of a public governmental body] of all costs and reasonable attorney fees to any party successfully establishing a violation." The trial court awarded attorneys' fees under this section.

Further, the trial court is considered an expert on attorney's fees, and the court has discretion to determine the fee award. *Klinkerfuss v. Cronin*, 289 S.W.3d 607, 613 (Mo. App. E.D. 2009). We will reverse the trial court's award only when we find an abuse of discretion. *Id.* "A court abuses its discretion when it awards an amount so arbitrarily arrived at, or so unreasonable, as to indicate indifference and a lack of proper consideration." *Id.* The complaining party carries the burden of establishing an abuse of discretion. *Id.*

The Board's conduct in failing to reveal, until very late in the litigation, the parallel criminal and IAD investigatory files, along with its sham consent agreement with the police officers that bypassed Chasnoff in order to avoid the ordered records disclosure, support an award of attorneys' fees to Chasnoff for the enforcement of his 2010 judgment under the Sunshine Law.

20

As the trial court determined, the Board's conduct during the course of this extensive litigation establishes its knowing violation of the Sunshine Law. Chasnoff's intervention in the police officers' action was undoubtedly necessary to enforce his 2010 judgment ordering disclosure of the records at issue. The trial court did not abuse its discretion in awarding attorneys' fees under section 610.027.3. We deny the Board's first point. Because we conclude that the trial court properly awarded attorneys' fees under the Sunshine Law, we need not consider the Board's second point, and so deny it as moot.[8]

*Conclusion*

We conclude that the police officers have no right under the Sunshine Law, the U.S. or Missouri Constitutions, common law, or Missouri statutes to compel closure of public records regarding their substantiated misconduct in the performance of their official duties.

Further, we find that while the police officers may have assumed, or hoped, that their *Garrity* statements would remain secret if used only for internal purposes, no one from the police department promised them anything more than that the statements would not be used against them in a subsequent criminal prosecution. Thus, the police officers have no right to compel closure of the records at issue on this basis.

Finally, the Board's conduct in failing to reveal the parallel criminal and IAD investigatory files and its sham consent agreement with the police officers, which sought to

---

[8] We do, however, find additional support for the award of attorneys' fees to Chasnoff under an exception to the American Rule on attorney's fees. Missouri adheres to the American Rule, which means that generally, absent statutory authorization or contractual agreement, each litigant pays his or her own attorney's fees. *Klinkerfuss*, 289 S.W.3d at 618. The learned trial judge determined that the collateral-litigation exception to the American Rule also justified the award of attorneys' fees. We agree with the trial court's conclusion that an exception to the American Rule applies, but we would apply the exception for special circumstances or very unusual circumstances arising from the Board's misconduct. The Board compounded its knowing violation of the Sunshine Law when it failed to timely reveal its parallel criminal and internal investigatory files and when it entered into a sham consent agreement with the police officers. That agreement sought to circumvent Chasnoff in order to prevent disclosure of the very records that the trial court had previously ordered disclosed. The Board's agreement with the police officers thus necessitated another appeal, resulting in this Court's decision in *Chasnoff II*.

bypass Chasnoff in order to avoid disclosure of the records previously ordered disclosed, justifies the award of $100,000 in attorneys' fees to Chasnoff for the enforcement of his 2010 judgment under the Sunshine Law.

We affirm the trial court's judgment. The clerk of the trial court shall release the remaining documents from the IAD investigation upon the issuance of this Court's mandate in accordance with the trial court's stay order.

_____
LAWRENCE E. MOONEY, JUDGE

ANGELA T. QUIGLESS, C.J., and
MARY K. HOFF, J., concur.

22